WILLIAM R. SMITH, APPELLANT, vs. GUY RICHARDS, APPELLEE.

A bill was filed in the Circuit Court of the southern district of New York, praying that a contract for the purchase and sale of a portion of a tract of land in Goochland county, in the state of Virginia, on which there was a gold mine, should be rescinded. The purchaser alleged fraudulent misrepresentations as to the gold mine; and other arts of the seller, by which he was induced to make the purchase. The Court affirmed the decree of the Circuit Court of the southern district of New York, by which the contract was ordered to be rescinded.

It is an ancient and well established principle, that whenever *suppressio veri*, or *suggestio falsi* occur, and more especially both together, they afford sufficient ground to set aside any release or conveyance.

The party selling property must be presumed to know whether the representation which he makes of it is true or false. If he knows it to be false, that is fraud of the most positive kind; but if he does not know it, then it can only be from gross negligence: and in contemplation of a Court of Equity, representations founded on a mistake resulting from such negligence is fraud. The purchaser confides in them upon the assumption that the owner knows his own property, and truly represents it. And it is immaterial to the purchaser whether the misrepresentation proceeded from mistake or fraud. The injury to him is the same whatever may have been the motives of the seller. The misrepresentations of the seller of property, to authorize the rescinding a contract of sale by a Court of equity, must be of something material, constituting an inducement or motive to purchase; and by which he has been misled to his injury. It must be in something in which the one party places a known trust and confidence in the other.

Whenever a sale is made of property not present, but at a remote distance, which the seller knows the purchaser has not seen, but which he buys upon the representation of the seller, relying on its truth, then the representation in effect amounts to a warranty: at least the seller is bound to make good the representation.

ON appeal from the Circuit Court of the United States for the southern district of New York.

The case is fully stated in the opinion of the Court. It was argued by Mr. Patton and Mr. Webster, with whom was Mr. Botts, and Mr. Ogden, for the appellant; and by Mr. Berry and Mr. Crittenden for the appellee.

In the Circuit Court for the southern district of New York, a bill was filed by Guy Richards, for the purpose of rescinding a contract made by the appellee with William R. Smith, for the purchase of a part of the Goochland gold mine in the state of Virginia, the contract being alleged to be fraudulent. It was agreed by the counsel for the parties, that a decree should be entered in the Circuit Court, pro forma, against the complainant; and accordingly, on the 22d of April, 1837, a decree was entered, rescinding and annulling the contract in relation to the purchase of the Goochland mine, ordering that it be given up to said Guy Richards; that the appellant Smith repay all moneys advanced by said Guy Richards upon said contract, and upon the promissory notes made by complainant and delivered to the defendant, so far as said notes had been paid by complainant, &c. From this decree an appeal has been prayed and allowed to this Court.

The counsel for the appellant insisted that the decree was erroneous and ought to be reversed, and the bill dismissed.

" 1. Because the said complainant has wholly failed to prove that the representations and description of the Goochland mine alleged in the bill to be unfair and untrue, are other than fair, accurate, and just descriptions and representations; and that on the contrary thereof, the proofs in the cause show that the representations, declarations, and descriptions made and given of said mine, so far as the same are complained of in said bill, were and are true, just, and faithful.

2. Because the opinions and estimates made by the appellant of the value of said mine and of its richness and great worth, and which are alleged in the bill to have been false, exaggerated, and deceptive, and made for the purpose of defrauding and deceiving the complainant, were not only his real, honest, and bona fide opinions, but were such as he was well warranted in entertaining and expressing.

3. Because, even if the Court should be of opinion that the estimates of the value and richness of the mine and vein, expressed by the appellant, were exaggerated and extravagant; he is in no manner at law or in equity responsible for such exaggerated and unfounded statements as to the value and richness of said mine, and its veins or deposites of gold.

4. Because, even if all the descriptions of said mine, and all the declarations made in regard to it by said complaint, as set forth in said bill as untrue, inaccurate and erroneous, were so in fact; it would not be competent, either at law or in equity, to rescind the contract which had been executed for the purchase and sale of the property, unless it had been proved that the appellant knew that such descriptions and declarations were inaccurate. erroneous, and false.

5. Because, so far from the plaintiff having succeeded in showing any such knowledge, the testimony clearly proves, that the appellant did believe, and had just reason to believe that his descriptions of said mine, and representations of its value, were strictly and literally true, just, and accurate.

6. Because, it is distinctly and expressly admitted by the complainant, and proved by the testimony, that certain specimens or washings of gold ore, forwarded by the appellant Smith to Nathaniel Richards, and alleged to have been taken from said Goochland mine, and exhibited to him as fair samples of said mine, were exceedingly rich in particles of gold, and gave every indication that the mine from which they were taken, if the said specimens were proper and fair samples of such mine, must be very abundant in gold, and of great intrinsic value. And it is clearly and conclusively shown that the said specimens were really and fairly taken from said mine, in a way and manner to ensure their being fair and proper samples of the mine; and that many other specimens had been taken from it by others before Smith was interested in or knew, any thing of said mine, of equal richness with the specimens forwarded to Nathaniel Richards by him.

7. Because, even if the proof should be considered as having established that the cuts, searches, examinations, and explorations made since the purchase by the complainants and others from the appellant, have demonstrated that the mine is not as valuable as the indications warranted Smith to believe, or even that the property is wholly worthless as a mine, (and it is by no means admitted, that such examinations have been sufficiently extensive or well conducted to justify such conclusions,) yet that the appellant is not responsible for such failure of the mine to realize the expectations justly founded upon the indications of value and richness which existed at the time of, and before the sale; whether the disappointment has resulted from the veins giving out, being intercepted by rock, or whatever cause of the like kind. Such contingencies and disappointments are always to be hazarded in every kind of speculative adventure; and adventures in gold mining have never been, in any country, remarkable for exemption from them. And the appellant in this case did not undertake to insure against them by any act or expression. On the contrary, it is proved, that the complainant and those who united with him in the purchase, were fully alive to the risks and hazards attendant upon all gold mining adventures and speculations; and were emphatically admonished of these hazards, when the appellant exonerated himself from responsibility for their occurrence, by the explicit declaration, made at the time of the contract, that he sold the mine 'for what it is, gold or snowballs.'

8. Because, the property being expressly sold with all faults ('for what it is, gold or snowballs,') accordingly to the settled rules of law applicable to such a contract, the vendor cannot be made responsible for any defect in the quality of the thing sold, or for any misdescription, known or unknown to the said vendor; unless it also appear that he committed positive fraud, by resorting to some means of concealing the defects and misdescription, and by artifice and contrivance prevented the purchasers from discovering them."

The counsel for the appellant, in support of the third point, "that even if the Court should be of opinion, that the estimates of the value and richness of the mine and vein, expressed by the appellant, were exaggerated and extravagant, he is in no manner at law or in equity responsible for such exaggerated and unfounded statements as to the value and richness of said mine, and its veins or deposites of gold." The following authorities were cited. Sugden, Law of Vend. 2. Chandler *vs.* Lopus, C. Jac. 4. 1 Rollis, Abr. 801, (pl.) 16. Harvey *vs.* Young, Yelverton, 21, (b.), and notes to the American edition. Fenton *vs.* Browne, 10 Ves. 144. 1 Salk. 211. Risney *vs.* Selby; S. C. 2 Lord Raymond, 1118. Sugden, Law of Vend. 4, in note Amer. edit. of 1828. Kinnard *vs.* Lord Dean, 1 Coll. Dec. 332. Roswell *vs.* Vaughan, Cro. Jac. 126. Sherwood *vs.* Salmon, 2 Day's Reports. Davis *vs.* King, 1 Starkie, Rep. 61. Whitefield *vs.* M'Leod, 2 Bay. 380–384. 1 Levinz. 102. Pollard *vs.* Lyman, 1 Day, 156.

[Smith *vs.* Richards.]

In support of the fourth proposition, that "even if all the descriptions of said mine, and all the declarations made in regard to it by said complainant, set forth in the said bill as untrue, inaccurate, and erroneous, were so in fact, it would not be competent either at law or in equity to rescind the contract which had been executed for the purchase and sale of the property, unless it had been proved that the appellant knew that such descriptions and declarations were inaccurate, erroneous, and false."

The counsel for the appellant cited, first; cases showing the distinction between the degree of unfairness and proof of fraud, required to authorize a Court of equity to refuse specific performance, and that necessary to justify a rescission of a contract. Ellard *vs.* Lord Landaff, 1 Ball and Beatty. Cathcart *vs.* Robinson, 5 Peters' Rep. 276. 10 Ves. 292.

2. Cases showing that the rule, caveat emptor, prevails in England, New York, and Virginia, both as to real and personal property; and that to rescind a contract there must be actual fraud and intentional misrepresentation.

3. That in sales of real estate the rule applies even as to title, viz. Roswell *vs.* Vaughan, Cro. Jac. 196. Pollard *vs.* Layman, 1 Day, 156. Hitchcock *vs.* Giddings, 4 Price, 135. Yelverton, 21. (b.) Notes, American Ed. Commonwealth *vs.* M'Clehahan, 4 Rand. 482. Chesterman *vs.* Gardiner, 5 John. Ch. R. 29. Abbott *vs.* Allen, ib. 523.

As to defects of quality or misdescription, there can be no rescission or responsibility upon the vendor, unless there be a warranty—fraud, or intentional misrepresentation. Parkinson *vs.* Lee, 2 East, 314. Sands *vs.* Taylor, 5 John. R. 395. Duke of Norfolk *vs.* Wortly, 1 Camp. 337. Seixas *vs.* Wood, 2 Caines' Rep. 48. Oldfield *vs.* Round, 5 Ves. 508. Dyer *vs.* Lewis, 7 Mass. 284. Legge *vs.* Croker, 1 Ball and Beatty, 506.

As to the eighth point, "that the property being expressly sold with all faults, (for what it is, gold or snowballs,) according to the settled rules of law applicable to such a contract, the vendor cannot be made responsible for any defect in the quality of the thing sold, or for any misdescription, known or unknown to the said vendor; unless it also appears that he committed positive fraud, by resorting to some means of concealing the defects and misdescription, and by artifice and contrivance prevented the purchasers from discovering them."

The counsel for the appellant cited Oldfield *vs.* Round, 5 Ves. 508. Baglehole *vs.* Waltens, 3 Camp. 154. Schneider *vs.* Heath, 3 Camp. 506. Pickering *vs.* Dowson, 4 Taunt. 779. Sherwood *vs.* Salmon, 2 Day. Tucker *vs.* Cocke, 2 Rand. 57. Green's opinion, 65. Vernon *vs.* Keegs, 12 East, 632. S. C. 4 Taunt. 488.

Mr. Berry and Mr. Crittenden, for the appellee, insisted that the description of the property sold was materially false in the particulars set forth in the brief of the appellee; that the false description

was given by the appellant, with the design to deceive, and that he adopted measures to conceal the matters of false description; and contended that even if the contract of the parties could be construed a sale with all faults, that 'the case came within the principles decided in the case of Schneider vs. Heath, 3 Camp. 506.

.But they contended that the contract was not to be construed a sale with all faults; and referred to Pickering vs. Dowson, 4 Taunt. 779.

If so, they contended that the sale was fraudulent and ought to be set aside, on the authority of adjudged cases; and cited Boyce's executors vs. Grundy, 3 Peters, 210. 1 Merev. 26. Donalson vs. Weakley et al. 3 Yerger's Rep. 178. Sherwood vs. Salmon, 5 Day's Rep. 439. .They further contended that if the false representations should be considered as made by mistake, that being so in matters which formed the inducement to the contract on the part of the appellee, a Court of equity ought to relieve by rescinding the contract: and cited 1 Story's Eq. 202. 204. McFerran vs. Taylor, 3 Cranch, 270. Glassell vs. Thomas, 3 Leigh, 113. Chamberlane vs. Marsh, 6 Mun. 283. Pearson vs. Morgan, 2 Bro. Chan. 389. Allen vs. Hammond, 11 Peters, 63. Calvery vs. Williams, 1 Ves. Jr. Hitchcock vs. Geddings, 4 Price, 133. Lowndes vs. Law, 2 Coxe's Cases, 363.

Mr. Justice BARBOUR delivered the opinion of the Court.

. This case comes before us, by appeal from a decree of the Circuit Court for the southern district of New York.

. I' was a suit in equity, brought by the appellee against the appellant, to set aside a contract for fraud.

. It appears that in December 1832, a tract of land, embracing a gold mine, called the Goochland mine, lying in the county of Goochland, Virginia, was purchased by the appellant, one-third for himself, and two-thirds for Nathaniel Richards, of the city of New York, at the price of about $14,000. In May, 1833, the appellant sold one-half of his third to Nathaniel Richards, for $15,000. In June, 1833, he sold five-sixths of the other half to the appellee and others, at the rate of $45,000 for the whole of that half.

The interest which the appellee acquired in this property, was one-eighth part of one-sixth, at the price of $5,625; as evidence of which he received from Nathaniel Richards, who acted as the appellant's agent in making the sale, a writing dated July 4th, 1833, acknowledging the receipt of the purchase money, in cash and several notes of hand. This paper described the property thus sold and bought, as one-eighth part of one-sixth of four hundred and fifty-six acres of land, and of one hundred acres purchased of David Moss, the deeds bearing date 17th of May, 1833; both parcels lying in the county of Goochland, and state of Virginia, and called the Goochland mine.

It declares that the receipts (that is of the cash and notes) entitle Guy Richards (the appellee) to the one-eighth portion of one-sixth

part of said property; and it assumed that form, as the paper shows, because the title to all was in Nathaniel Richards, although one-sixth part belonged to the appellant.

In the same paper is contained the following provision: "It is hereby expressly understood and agreed to by the said Guy Richards, that he is to contribute his full proportion of any expenses already incurred, or which may be incurred hereafter on the said premises, in searching for or developing any mine, or mines, in the erection of buildings, the purchase of machinery, and any other expenses for the above general object, which I may deem necessary. Signed by Nathaniel Richards."

This is the contract which the bill seeks to set aside; it alleges, that the appellee was induced to make it by various representations and declarations of the appellant, especially those contained in certain letters, particularly referred to in the bill, written by the appellant to Nathaniel and Charles H. Richards, which the bill charges to have been false, fraudulent and deceptive, and made for the purpose of deluding and deceiving the appellee and other persons, and inducing them to purchase at an exorbitant and unconscionable price; and by specimens of washings of said gold mine, which were exhibited to the appellee, as fair specimens and samples of the Goochland mine, which the bill charges were not fair samples; and that the appellant knew that they were not fair samples, and that he caused them to be exhibited to the appellees as fair specimens and samples of said mine, for the express purpose of defrauding him, by inducing him to purchase a part of his interest in said mine, upon the faith of said specimens, as well as the false, fraudulent, and deceptive representations. The bill further charges, that one of the letters of the appellant to Nathaniel Richards, dated January 21st, 1833, containing a description of the Goochland mine, was read to him, and the specimen exhibited to him, at the express request of the appellant, by Nathaniel Richards, in the month of June, 1833, a short time before his purchase.

It further charges, that the appellant had represented to the appellee, that he was well skilled in the business of mining, having been employed in that business in South America; that he understood the directions of veins in a mine, and the cost and expense of extracting gold from the foreign materials, by which it is surrounded, and in which gold is most usually found. That the Virginia Mining Company, relying upon the fitness of the appellant for the business aforesaid, and his skill in the principles and process of mining, employed him as their agent; and that during the whole time of the negotiations and representations concerning the Goochland mine, he was the agent of the Virginia Mining Company. That the appellee never was at the Goochland gold mine, nor did he ever visit the tract of land in which it was represented by the appellant to be situated; but that in the months of June and July, 1833, believing the appellant to be a man of strict honour, honesty, truth, and veracity, he reposed the most implicit faith in his decla-

rations with regard to said gold mine, and relied exclusively upon his representations, especially his letter of the 21st January, 1833, to Nathaniel Richards, and his several letters to Charles H. Richards, as containing accurate, fair, and correct descriptions of the Goochland mine.

The bill then proceeds to charge certain specific misrepresentations in the following particulars, to wit:

1st. That there are not, and never have been, any veins of gold whatever in the Goochland mine, and that that fact was well known to Smith, at the time when he wrote the letters, and made the representations before stated; and that neither one hundred nor any other number of feet, on a vein in said mine, was or were, at the date of the letter from the appellant to Nathaniel Richards, or at any other time, opened or developed.

2dly. That so far from there being rich veins of gold in the mine, as the appellant in the last mentioned letter (that is, as we understand it, of the 21st of January, 1833, to Nathaniel Richards) asserted · that there were cuts, and searches which had recently, and since his purchase been made, at the said mine in various directions, and no veins of gold whatever could be discovered: and that the purchasers thereof, including the appellee, had been compelled, after many searches, sinking shafts, making cuts and experiments, and expending a great deal of money in the enterprise, to abandon the search after gold in said mine; to dismiss their workmen, and give up the project of mining altogether.

3dly. That there are, and were at the time of the appellant's representations in relation to said mine, fine particles of gold to be found on the premises, included within the bounds of the Goochland mine. But that such particles are and were so minute, so few, and so mixed up with sand and other foreign substances, that the cost of extracting the gold from such materials would far exceed the value of the gold when extracted: and that the four hundred and fifty-six acres, and the one hundred acres of land specified in the receipt of Nathaniel Richards, before stated, are utterly worthless as a gold mine; and the appellee's interest therein is of no value whatever.

4thly. That the specimens of washings of said gold mine, exhibited to the appellee and others, by the order and direction of the appellant, as fair specimens and examples of said gold mine, are not, and were not at the time when they were forwarded by the appellant to Nathaniel Richards, fair samples, or specimens of said mine; and the appellee expresses his belief that they were not taken from the Goochland mine.

5thly. That the Goochland premises do not contain veins of gold, nor any considerable deposites of gold; nor are they rich in gold, or of any value whatever, for any purpose of mining, either for gold, or any other metal.

The answer of the defendant, in various parts of it, utterly and unqualifiedly denies any intention or purpose to deceive or delude

the appellee, or that he had ever done, or permitted to be done, any thing to produce that effect. It denies that he ever made any inflated representations, or false descriptions of the mine, to induce any person to give an inordinate price for his interest therein. It insists that in the letter of the 21st January, 1833, to Nathaniel Richards, his object was to give a true and accurate account of the Goochland mine, so far as the facts could be ascertained by his own observation and from the information of others on whom he could rely; and that in those addressed to Charles H. Richards, no fact was stated as being known to him, which was untrue so far as facts are given, in reference to the Goochland mine; and that as well in the before mentioned letter to Nathaniel, as in those to Charles H. Richards, as far as opinions were expressed, they were honestly entertained, without any intention, motive, or purpose to deceive the appellee, or any person whatever. It insists that the specimens of gold ore sent by him to Nathaniel Richards were fair samples of the mine; and denies that these specimens were directed by him to be exhibited to the appellee, or any other person, with a design of deceiving or defrauding any person to whom they might be shown.

It insists, in general, that in all the statements he ever made, at any time, to any person concerning the Goochland mine, whether in writing or verbally, so far as facts were given within his knowledge, they were strictly true; so far as the information derived from others was given he believed it to be true; and so far as his opinion has been expressed on the subject of the Goochland mine, such opinion was honestly entertained, without any interest, motive, or view, directly, or indirectly, to deceive the appellee or any other person. It insists, that there are and were veins of gold in the Goochland mine, and that from personal examination, before any representation was made, he knows that the Goochland mine contains veins of gold of extraordinary richness, and of great intrinsic value. It insists that, at the time he wrote the letter to Nathaniel Richards, there were an hundred feet or upwards, according to his best judgment, developed on the vein in said mine.

The answer admits, that the appellant may have been informed by Nathaniel Richards, that he had shown or read the letter of the 21st January, 1833, to the appellee and others, but at what time he is unable to state: that he was informed by Charles H. Richards, that said letter had been read to him and others, including the appellee, before the purchase made by him and them of his interest in the Goochland gold mine: that he had been informed, and believes it to be true, that about the month of June, 1833, Nathaniel Richards did exhibit to the appellee and others the specimens or washings of gold ore, forwarded by the appellant, as specimens of the Goochland mine, and its productions of gold: that in June, 1833, the appellant wrote several letters to Charles H. Richards: that in describing the Goochland mine in those letters he used language of a very decided character, as being the very richest mine in Vir-

ginia, or in the United States: that the appellant esteemed himself well skilled in the business of mining, and that the appellee relied on such skill in making the purchase: that during the whole time of the negotiation and representations concerning the Goochland mine, he was employed as the agent of the Virginia Mining Company: that the appellee did not visit the mine, or the tract of land on which it was, before he bought an interest therein: that the negotiation for the purchase of the mine was carried on principally through Nathaniel and Charles H. Richards: that he believes the appellee, when he purchased an interest in the gold mine, fully believed the declarations and representations and letters of the appellant to be true, so far as he may have been informed thereof; and that he purchased an interest therein in the full reliance that whatever this defendant had said, declared, or written on the subject of the Goochland mine, was strictly true; but does not admit that the appellee purchased solely on the faith of his representations, declarations, and letters.

Having thus stated the material allegations in the bill, and as well the denials as the admissions in the answer, we are enabled to see what the questions are which we are called upon to decide. But, before we state them, we will present, in a condensed form, those parts of the representation, the alleged falsehood of which constitutes the gravamen of the appellee's bill. In the letter from the appellant to Nathaniel Richards, under date of January 21st, 1833, in which he professes to give an account and his views of the Goochland mine, amongst other things, he states that there has been upwards of one hundred feet on the vein developed, which proves to be very rich indeed, much richer than any thing yet discovered in the United States; and the quanty of the gold surpasses any heretofore discovered in any country: that the surface is rich in gold. In regard to the formations in which the ore is found, he says—It is quite wide, a distance in one place of twelve feet has been cut, and the veins are disseminated throughout the whole formation, in threads of from two to six inches wide, and in many have several concentrated together; at another point it has been found to be several feet wider: and that there is ore from this mine that will, without doubt, give several hundred pennyweights of gold to the hundred pounds. This letter was written after the appellant had, as he himself says, made a careful personal examination of the vein as far as it had been developed, which he says was for a distance of one hundred feet lengthwise.

On the 11th of June, 1833, the appellant wrote to Nathaniel Richards, requesting him to show all the specimens, washings, plat, and description of the mine, to Guy, (the appellee,) and others. This letter and these specimens, washings, &c. were shown to the appellee in compliance with this request. The representations in relation to the mine, then, consist, in part, of the statements above, extracted from the letter of the 21st of January, 1833, which was shown or read to the appellee; and, in part, of the specimens, wash-

ings, &c. exhibited to him at the appellant's request, whilst a nego-
tiation was going on between the appellant and Charles H. Richards,
for the purchase of the appellant's interest in the mine, for himself
and others, of whom the appellee was one, and but a very short
time before the purchase was made.

The first question in order is, were these representations true or
untrue?

We have examined the evidence in the record on both sides, with
much care. And we think it unnecessary to go into a detailed exa-
mination and comparison of that evidence here, inasmuch as it would
extend this opinion to a useless length. We, therefore, will only
state the conclusions of fact at which we have arrived. They are
these:—

We think it not true, that there was one hundred feet developed
on the vein, which proved to be very rich indeed. We do not mean
to say, that a continuous exposure of the vein for one hundred feet
was implied by the use of the term developed; on the contrary, we
are of opinion, from the evidence, that the sinking shafts, or making
cuts, at intervals, for that distance, would satisfy the meaning of this
expression, and that we think was done. But we mean to say, that
although there was a small quantity of ore found in part of this vein,
which was rich, yet in any one of the pits it was relatively a small
proportion; that in some there was but little, and in one, we think
the weight of evidence is, that there was none at all.

We think it not true, that the surface was rich in gold.

We think it not true, that the formation was at any point twelve
feet wide, or that the veins were disseminated throughout the whole
formation, in threads of from two to six inches wide, and in many
had several concentrated together.

We think it not true, that there was ore from that mine, that
would give several hundred pennyweights of gold to the hundred
pounds. We will not say that there might not be a small piece
selected which would yield at that rate: but we think that this re-
presentation was calculated to produce the impression, and justify
the belief, that an hundred pounds of ore might be gotten together,
which would produce several hundred pennyweights of gold. Any
other interpretation of this language would, in our opinion, impute
to the appellant the grossest deception.

We think that the specimens and washings which were forwarded
to Nathaniel Richards were not fair samples of the mine.

The only proper purposes for which they could have been exhi-
bited, was to enable purchasers to form an estimate of the richness
of the mine: the appellant, therefore, in our opinion, ought to have
caused to be exhibited, either specimens of the richest and poorest
quality, so as to show the extremes; or some of an average quality.
knowing that the persons to whom he requested them to be exhi-
bited, and an igst them the appellee, had never seen the mine.
Any other col so, under the circumstances, could not fail to produce
a false estim of its value.

Having come to these conclusions in relation to the facts of this case, the next inquiry in order is, what is the law of the case?

It is an ancient and well established principle, that whenever suppressio veri or suggestio falsi occur, and more especially both together, they afford a sufficient ground to set aside any release or conveyance.

This ancient principle, thus expressed with so much sententious brevity, is laid down in terms somewhat more comprehensive, and having a direct bearing on the present case, by a modern text writer on equity.

In 1 Maddock's Chancery, 208, it is thus stated. If, indeed, a man, upon a treaty for any contract, make a false representation, whether knowingly or not, by means of which he puts the party bargaining under a mistake upon the terms of bargain, it is a fraud, and relievable in equity. The doctrine thus laid down is almost in the very words used by the chancellor, in the case of Neville vs. Wilkinson, 1 Brown's Chan. Cases, 546, with the exception of the words, whether knowingly or not; and the part of the proposition embraced by these words, is founded upon the case of Ainslie vs. Medlicot, 9 Vesey, 21, which fully sustains Mr. Maddock. In this latter case the following strong language is used. "No doubt, by a representation a party may bind himself just as much as by an express covenant. If, knowingly, he represents what is not true, no doubt he is bound. If, without knowing that it is not true, he takes upon himself to make a representation to another, upon the faith of which that other acts, no doubt he is bound; though his mistake was perfectly innocent."

But the doctrine is laid down with more comprehensiveness and precision, by a still more modern writer on equity; who gives us, in the form of distinct propositions, what he considers the result of the various cases on the subject, and marks, with particularity, the modifications which belong to it.

In 1 Story's Equity, 201, 202, it is thus stated. "Where the party intentionally, or by design, misrepresents a material fact, or produces a false impression, in order to mislead another, or to entrap or cheat him, or to obtain an undue advantage of him; in every such case there is a positive fraud, in the truest sense of the terms; there is an evil act, with an evil intent; dolum malum, ad circumveniendum. And the misrepresentation may be as well by deeds or acts, as by words; by artifices to mislead, as by positive assertions."

Whether the party thus misrepresenting a fact, knew it to be false, or made the assertion without knowing whether it were true or false, is wholly immaterial; for the affirmation of what one does not know, or believe to be true, is equally in morals and law, as unjustifiable as the affirmation of what is known to be positively false. And even if the party innocently misrepresents a fact by mistake, it is equally conclusive; for it operates as a surprise and imposition on the other party. Or, as Lord Thurlow expresses it, in Neville vs.

Wilkinson—"it misleads the parties contracting, on the subject of the contract."

The author of the treatise last cited thus states the modifications of the doctrine:

The misrepresentation must be of something material, constituting an inducement, or motive to the act, or omission of the other, and by which he is actually misled to his injury.

In the next place, the misrepresentation must not only be in something material, but it must be in something, in regard to which the one party places a known trust and confidence in the other. It must not be a mere matter of opinion, equally open to both parties for examination and inquiry; and where neither party is presumed to trust to the other, but to rely on his own judgment.

The doctrine of these text writers is illustrated by the cases in the books, some of which present very strong applications of it; for it is held to extend not only to the parties to the contract, but also to others, who, from gross negligence, are guilty of misrepresentation. Thus, for example, in the case of Pearson vs. Morgan, 2 Brown's Ch. Cases, 385, where A, being interested in an estate in fee, which was charged with £8000 in favour of B, was applied to by C, who was about to lend money to B, to know whether the £8000 was still a subsisting charge on the estate. A stated that it was, and C lent his money to B accordingly. It appeared, afterwards, that the charge had been satisfied: yet it was held that the money lent was a charge on the lands in the hands of A's heirs, because he either knew, or ought to have known the fact of satisfaction, and his representation was a fraud on C.

Of a similar character was the case of Hobbs vs. Norton, 1 Ver. 136, where one entered into an agreement for the purchase of an annuity, charged on the lands of a third person; and was encouraged in the course of the transaction by the latter, who suggested his own title, and it afterwards appeared, that such title was of a nature to have enabled the owner to avoid the annuity; yet he was, as to the purchaser, held under an obligation to confirm it.

Cases of this class present the principle in its strongest aspect; because in these cases, the parties making the representation were bound by it to prevent a loss to others, although they themselves derived no advantage from it; whereas, in those instances in which the parties to the contract made the representation, they would receive benefit to the amount of the loss which the misrepresentation would produce to the other party, who acted on the faith of it; if the Court did not relieve against it.

This principle has been adopted in the Courts of our own country. In Fulton's executors vs. Roosevelt, 5 John. Ch. Rep. 174, the case was this: Fulton was induced by the representations of Roosevelt, that he had discovered a valuable coal mine on the bank of the Ohio river, to contract for the purchase of a tract of land, stated by Roosevelt to embrace the mine; and besides giving to Roosevelt $4400. Fulton covenanted to pay him $1000 annually, for twenty

years; but the annuity was to cease, if, after the mine was faith-fully worked by Fulton, it should not produce at least $12000, &c. And the land was accordingly conveyed to Fulton. It appeared that there was no coal mine within the boundaries of the land con-veyed; although there was coal adjoining it, in the bed of the river, which was navigable, deep, and rapid : but the working of the mine, if practicable, would be very hazardous, expensive, and unprofit-able. The contract on the part of Fulton was held to be founded in mistake and misrepresentation; and Roosevelt was perpetually enjoined from bringing any suit against Fulton, to recover the an-nuity agreed to be paid him.

In that case the chancellor says : whether the defendant made the statements in his letter to Fulton through mistake, or under the de-lusions of his own imagination, or by design, I am not able to say. It is sufficient for the decision of this case, that the representations are not supported, but are contradicted by proof, and that the claim of the annuity, upon such a state of the case, is unconscientious and unjust. And this decree was affirmed in the Court of errors, 2 Cowen, 129.

In the case of McFerran *vs.* Taylor & Massie, in this Court, in 3 Cranch, 281, the Court, after remarking that there was a material misrepresentation, and that the defendant had contended that it ori-ginated in mistake, not in fraud, say : from the situation of the par-ties, and of the country, and from the form of the entry, it was rea-sonable to presume, that this apology is true in point of fact; but the Court does not conceive that the fact will amount to a legal jus-tification of the person who has made the misrepresentation. He who sells property on a description given by himself, is bound to make good that description; and if it be untrue in a material point, although the variance be occasioned by a mistake, must still remain liable for that variance.

The principles of these cases we consider founded in sound morals and law. They rest upon the ground that the party selling property must be presumed to know whether the representation which he makes of it is true or false. If he knows it to be false, that is fraud of the most positive kind; but if he does not know it, then it can only be from gross negligence : and in contemplation of a Court of equity, representations founded on mistake, resulting from such negligence, is fraud. 6 Ves. 180. 189. Jeremy, 385, 386. The pur-chaser confides in it, upon the assumption that the owner knows his own property, and truly represents it; and, as was well argued in the case in Cranch, it is immaterial to the purchaser whether the misrepresentation proceeded from mistake or fraud. The injury to him is the same, whatever may have been the motives of the seller.

We will next inquire whether the misrepresentation in this case comes up to the rule which has been laid down. In the first place, it must be of matters of fact; and it has been argued by the appel-lant's counsel, that the letter of the 21st of January, 1833, did not profess to state matters of fact, but to express opinions. It is cer-

tainly true, that matters of opinion between parties dealing on equal terms, although falsely stated, are not relieved against; because they are not presumed to mislead, or influence the other party, when each has equal means of information. But we consider the representation in this case not the expression of opinion, but the statement of facts. The appellant, in giving a description of a mine in Virginia, which he desired to be exhibited to the appellee in New York, says, that one hundred feet on the vein had been developed, which proved to be very rich, much richer than any thing yet discovered in the United States. That the surface was rich in gold; that the formation was quite wide, and in one place twelve feet; that the veins were disseminated throughout the whole formation, in threads of from two to six inches wide; and that there was ore from the mine that would without doubt give several hundred pennyweights of gold to the hundred pounds. Now, as to one of these statements, beyond all question it is a matter of fact; we mean the one which describes the width of the formation and veins.

Having made a personal examination, he declares the formation to be wide, gives the actual width in one place, and then the width of the veins, in terms not of conjecture, but of the most positive assertion. He gives their dimensions by feet and inches. This statement, then, comes up to the standard of mathematical certainty. And even in regard to the others, he does not profess to speak of them from conjecture, but speaks of them as they are, without qualification. Take, for example, this:—The surface is rich in gold. Not that he thinks it will turn out to be rich, but that it is rich. It was argued, that there was no standard by which to decide what quantity of gold would justify calling it rich. There is none by which it can be decided with mathematical certainty: but the law does not require it. Suppose that a seller was to describe to a distant purchaser, a tract of land as being rich, and it were proven to be poor, or very poor. Can it be that a Court of equity would not give relief in such a case? The certainty in the one case is as great as in the other; and the misrepresentation as to richness must be proven in each case, by the evidence of those who understood the quality of the one or the other.

In the next place the misrepresentation must be of something material, constituting an inducement or motive to the appellee to purchase, and by which he has been actually misled to his injury.

Now, in our opinion, that is emphatically the case in the suit before us. The mine, we think, not only constituted a motive, but the sole motive to the purchaser: he was induced to purchase an interest at a high price, in that which has turned out to be worthless; and he has, therefore, been misled greatly to his injury.

It must, in the next place, be in something in which the one party places a known trust and confidence in the other.

Nothing could be stronger than the confidence here, because the appellee had never seen the mine, and the appellant knew it; the appellee had seen the letter of description and specimens, and the

appellant knew that he had; the appellee confided in the truth of the appellant's representation, and his skill in mines, and in mining operations, and the appellant knew that he did.

But it has been earnestly contended at the bar, that whatever might be the effect of misrepresentation in cases in which there was nothing to countervail it; that in this case, at least, it cannot avail the appellee, on account of the particular character of the contract.

The purchase of an interest in the gold mine was made through the agency of Charles H. Richards, acting for himself and others, and amongst them, for the appellee. Richards, by his letter of the 18th June, 1833, to the appellant, amongst other things, said, "But after all the above named gentlemen (amongst whom was the appellee,) had seen your letter, we concluded, at any rate, we would look at the samples of ore, and have done so, and your letter describing the premises to N. R. (Nathaniel Richards,) he read to us. The ore is rich beyond dispute; but how much there is of it, remains to be seen. In regard to the extent of the mine, and its richness, we must, of course, rely on your judgment." The appellant in his letter of the 21st of June, 1833, in reply to the above letter of Charles H. Richards, speaking of the gold mine, says: "I, however, sell it for what it is, gold, or snow balls; and I leave it to you to decide, whether you will take it at my price, or not." It is said that the contract having been concluded, upon the basis of this correspondence, the purchase was one, with all faults; that is in effect, that the seller was absolved from all liability, by reason of any representation which he had made, in relation to the mine.

In support of this proposition, several cases have been cited at the bar: let us examine them.—The case of Baglehole *vs.* Walters, 3 Camp. 154, was this: The defendant being about to sell a vessel, the subject of the suit had printed particulars of sale, of which a copy was delivered to the plaintiff, in the following words: "For sale, the good brig Iris, burthen per register 208 tons; will carry 17 keels of coal and glass, or 300 loads of timber: has lately delivered a cargo of sugar from the West Indies, in excellent condition; is well found in all kind of stores, which are in good condition. Hull, masts, yards, standing and running rigging, with all faults, as they now lie." The plaintiff purchased two-thirds of the ship, which defendant conveyed to him in the common form. The plaintiff undertook to prove, that at the time of the sale, the ship had several secret defects in her; that these were known to the defendant; and that he did not disclose them to the plaintiff. And he relied upon a previous case of Mellish *vs.* Motteaux, Peake's Cases, 215, in which Lord Kenyon had held that the seller of a ship is bound to disclose to the buyer, all latent defects known to him; observing that the terms to which the plaintiff acceded of taking the ship with all faults, and without warranty, must be understood to relate only to those faults which the plaintiff could have discovered, or which the defendants were unacquainted with. But Lord Ellen-

borough, disapproving of the doctrine of the case above cited; held that where a ship is sold with all faults, the seller is not liable to an action, in respect of latent defects which he knew of without disclosing at the time of the sale, unless he used some artifice to conceal them from the purchaser.

In the same volume of Campbell, 505, a case is reported of Schneider and another vs. Heath, which was tried before Mansfield, Chief Justice; the opinion expressed by the Chief Justice is founded in so much good sense and justice, that we should have felt disposed, in a conflict of authorities, to have adopted it, even if it had not been, as, in the sequel of this opinion, we shall show it was, subsequently recognised and acted upon by the Court. The opinion is in these words: "The words," that is, with all faults as they lie, " are very large to exclude the buyer from calling upon the seller for any defect in the thing sold; but if the seller was guil·y of any positive fraud in the case, these words will not protect him. There might be such fraud, either in a false representation, o in using means to conceal some defect. I think the particular is evidence here, by way of representation; that states the hull to be nearly as good as when launched, and that the vessel required a most trifling outfit. Now, is this true or false? If false, it is a fraud, which vitiates the contract. What was the fact? The hull was worm-eaten, the keel was broken, and the ship could not be rendered seaworthy, without a most expensive outfit. The agent tells us he framed this particular, without knowing any thing of the matter. But it signifies nothing, whether a man represents a thing to be different from what he knows it to be, or whether he makes a representation which he does not know at the time to be true or false, if in point of fact it turns out to be false." As it appeared in the case that means had been taken, fraudulently, to conceal the defects in the ship's bottom, the case may not be an authority in favour of the opinion above quoted; yet it serves to show that the doctrine on this subject was not then settled. About the time that this last case was decided, the case of Pickering vs. Dowson, reported in 4 Taun. 779, was decided in the Common Pleas. That also was the sale of a ship, with all faults. A copy of the particulars was delivered by the seller to the buyer, which, amongst other things, represented the ship as being copper fastened, and as having recently undergone a thorough repair. It was proven that the ship was not copper fastened, and that the defendant knew she was leaky. The Court adhered to the doctrine of Lord Ellenborough, in Baglehole vs. Walters, and held that the seller was not responsible. Now, it will be observed, that all these cases were cases of ships, where the thing which was the subject matter of the contract was in such situation that the buyer had a full opportunity to inspect and examine the truth of the representation; and this we take to be the ground of decision in them. The meaning, says Heath Justice, in Pickering vs. Dowson, of selling with all faults, is, " that the purchaser shall make use of his eyes and un-

derstanding to discover what faults there are." This implies, in our opinion, that the thing must be in such situation as to enable him to make use of his eyes and understanding; and accordingly, in that case, "the full opportunity of the purchaser to inspect and examine the truth of the representation," is included in the marginal note of the case, as one of the terms of the proposition which exempts the seller from liability.

Now we think that this case is strikingly contradistinguished from that in the most important particular; that in this the purchaser had not full opportunity to inspect and examine. It is true, that it would have been in the purchaser's power to have travelled some hundreds of miles to Virginia, to examine the mine; so it was in the case which has been quoted from Johnson's Chancery Reports; but the Chancellor does not even intimate an idea that it was necessary for him to do so: so also in the case of Sherwood *vs.* Salmon, 5 Day's Reports, 439, the purchaser might by extraordinary diligence have examined the land; but the Court, in reference to this very subject, say, that where, from the remote situation of the land, or any other cause, a contract is made for the sale of land, without viewing it, there is the same reason that the seller should be responsible for a false affirmation respecting its quality, as for any other fraud.

We think we may safely lay down this principle, that wherever a sale is made of property not present, but at a remote distance, which the seller knows the purchaser has never seen, but which he buys upon the representation of the seller, relying on its truth, then the representation, in effect, amounts to a warranty; at least, that the seller is bound to make good the representation. No part of the reasoning of the cases which we have been reviewing applies to such a case; they proceed upon the idea, that where the subject of the sale is open to the inspection and examination of the buyer, it is his own folly and negligence not to examine. Chancellor Kent, in the second volume of his Commentaries, 484, 485, has justly said, that the law does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information. We think that this imputation cannot be made with any propriety against the appellee. The subject of the purchase was several hundred miles from him; he had never seen it; the seller knew that he had never seen it; in this situation he made a representation, both by description in his letter, and by the exhibition of specimens; the appellee bought upon the faith of that representation, the appellant knowing that the appellee had read the letter and seen the samples: finally, the appellee had a double confidence in the appellant; first, in his integrity, and secondly, in his skill in mining; and the appellant admits his belief that the appellee had this double confidence in him.

If, under these circumstances, the seller were not bound by his representation, we know not in what cases we ought to apply the

well-known and excellent maxim, "fides servanda est." We have now compared the cases, and upon principle, have shown, that they do not apply to this. But we will conclude our opinion, by referring to a case, later than all those which we have been examining, the reasoning of which is conclusive, as we think, in favour of the view which we have taken. It is the case of Shepherd vs. Kain, 5 Barn. & Al. 240. It was a case for the breach of warranty, as to the character of a ship. The advertisement for the sale of the ship described her as a copper fastened vessel; but there were subjoined these words: " The vessel, with her stores as she now lies, to be taken with all faults, without allowance for any defects whatever." It appeared at the trial, that the ship when sold, was only partially copper fastened, and that she was not what was called in the trade, a copper fastened vessel. It appeared also, that the plaintiff, before he bought her, had a full opportunity to examine her situation.

The Court said, the meaning of the advertisement must be that the seller will not be responsible for any faults which a copper fastened ship may have. Suppose a silver service sold with all faults, and it turns out to be plated; can there be any doubt that the vendor would be liable? With all faults, must mean, which it may have consistently with its being the thing described. Here, the ship was not a copper fastened ship at all ; and therefore the verdict was right. This case decides, that even where the plaintiff had a full opportunity of examination, the term, all faults, did not exempt the seller from liability for any defect but what was consistent with its being the thing described; and, in effect, that the description amounted to a warranty. In the case before us, where the appellee had no opportunity for examination, (and in that respect the case is much stronger in his favour than the one just cited,) the terms of the sale, in our opinion, put upon the appellee no hazard or risk, but those which were consistent with the mine being such as it was described; that those terms in no degree exempted him from liability for misrepresentation ; but if the mine had been such as described, then that they would have exempted him from any liability for failure in its anticipated produce.

It may be, that the appellant made the representation under the influence of delusion ; but it is sufficient, to decide this case, for us to know that the representation was untrue in material parts of it. The decree of the Circuit Court is affirmed with costs.

Mr. Justice STORY dissenting.—

In this case I have the misfortune to differ from a majority of my brethren. The bill seeks to set aside and rescind an executed contract, upon the ground of gross premeditated fraud, the contract being confessedly one of great hazard and founded in speculation. The answer fully and pointedly denies every allegation of fraud, and insists upon the most perfect good faith. The decree, by rescinding the contract, affirms the material charges of fraud stated in

the bill. After a careful consideration of the evidence in the record, my opinion is, that there is no just foundation for, or proof these charges. I do not propose to review the evidence, though take a very different view of it from what has been expressed in the opinion delivered by my brother Barbour; and there are many facts and circumstances, which have struck my mind with great force, which, I regret to find, are not deemed of equal importance by my brethren. I am not willing, by my silence, to sanction imputations upon the appellant, which cast so deep a shade upon his character, which the record shows has hitherto been without stain or reproach. In my opinion, the appellant stands acquitted of fraud, the victim, if you please, of a heated and deluded imagination, indulging in golden dreams; but in this respect he is in the same predicament with the appellee, and none other.

Mr. Justice M'LEAN dissented, stating that he agreed altogether with Mr. Justice Story.

Mr. Justice BALDWIN dissented, both as to the facts, and the law as stated in the opinion of the Court delivered by Mr. Justice Barbour.

On appeal from the Circuit Court of the United States for the southern district of New York. This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the southern district of New York, and was argued by counsel. On consideration whereof, it is adjudged and decreed by this Court, that the decree of the said Circuit Court in this cause be, and the same is hereby affirmed, with costs.

NOTE.—The counsel for the appellant afterwards presented a petition, praying for a re-hearing of this case, but the Court unanimously overruled the application.