FRANK A. DAYTON, Respondent, *v.* AMERICAN STEEL BARGE COMPANY, Appellant.

*Agreement by a broker to reduce his commission in reliance upon a statement innocently made by an agent of the vendee that a sale could not otherwise be effected — not enforcible if the statement be untrue — efficiency of an agent's acts.*

Where the owner of a steamship employs a ship broker to effect a sale thereof and agrees to pay him a five per cent commission upon the selling price and the broker secures a customer who ultimately purchases the property, a promise by the broker to the agent of the vendee, during the pendency of the

negotiations for the sale, to accept a stipulated sum in lieu of his commissions, made in reliance upon a representation made by the agent of the vendee, to the effect that, if this concession was not made, the sale would fall through, is not enforcible when it appears that such representation, although innocently made, was false, and that the sale had then been substantially consummated.
An agent cannot be deemed efficient to make a binding contract unless his whole conduct in the premises is effective to determine its validity.

APPEAL by the defendant, the American Steel Barge Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 12th day of November, 1901, upon the verdict of a jury, and also from an order entered in said clerk's office on the 15th day of November, 1901, denying the defendant's motion that a verdict be directed in favor of the plaintiff for the sum of $2,500 only, and granting the plaintiff's motion for an extra allowance of five per cent upon the amount of the verdict, and denying the defendant's motion for a new trial made upon the minutes.

*Jesse Stearns*, for the appellant.

*Herbert Green*, for the respondent.

Judgment and order affirmed, with costs, on the opinion of Mr. Justice RUSSELL, denying motion for new trial.

All concurred.

The following is, the opinion of Mr. Justice RUSSELL delivered at the Kings County Trial Term:

RUSSELL, J.:

The plaintiff recovered a verdict of $11,322.87 for broker's commissions on the sale of the steamship *City of Everett*. Before the cause was submitted to the jury the defendant requested the court to instruct the jury to render a verdict for the sum only of $2,500 and interest. That motion was reserved until the verdict of the jury upon certain specific questions and their general verdict was rendered. Upon the reserved motion counsel present their respective views as to what the verdict should be, the difference between them being the same as upon the trial, as to whether the plaintiff was entitled to a full commission of five per cent or only a fixed compensation of $2,500. The original agreement was for the five

per cent commission, and the defense relies upon a modification by agreement made the day of the sale to take $2,500 in order to insure a sale, which modifying agreement is attacked as founded upon mistake, misrepresentation or fraud.

The jury finds, aside from the general verdict:

*First.* "On the morning of Nov. 27th, 1899, were the negotiations practically at an end unless concessions were made by the American Steel Barge Company, the American Agricultural Company and the agents Curtis and Dayton? No."

*Second.* "Did the agreement of Curtis and Dayton to reduce commission to $2,500 constitute a procuring cause of the sale? No."

*Third.* "Did French intentionally mislead Curtis and Dayton as to the state of the negotiations for the sale, by reason of which Curtis and Dayton agreed to take $2,500, when in fact the sale would have gone through without such an agreement? Yes."

The steamship *City of Everett* was owned by the American Steel Barge Company, the defendant here. The Barge company was willing to sell on obtaining its price. It was represented primarily by Carpenter, its secretary, but in October, 1899, the stock of the company having been purchased by John D. Rockefeller, the remaining negotiations were mainly carried on by Gates, the business manager of Rockefeller. On the 3d of April, 1899, a charter party was given to the Chesapeake and Ohio Company. By this instrument the steamship was chartered for one year from the 5th of April, 1899. At any time after six months from the beginning of the charter the owners had the right to cancel upon thirty days' written notice, but said charterers had the right to immediately elect to purchase the steamer at the price agreed upon with a *bona fide* purchaser. On the 16th of September, 1899, the defendant, by Carpenter, Secretary, by letter, agreed to pay Curtis (who is represented by the plaintiff by assignment) a commission of five per cent on the selling price if Curtis succeeded in selling the steamer, and, if after his clients had given the defendant in writing a firm cash bid for the vessel, the Chesapeake and Ohio Company decided to buy her, a commission was to be paid the same as though he made the sale. The proposition was to remain open till the first of November. Between that date and the thirty-first of October, Curtis interested the American Agricultural Chemical Company, which

was in serious need of a steamer to carry its products from the southern part of this country to the north, in the purchase of the steamer. The latter part of October and the fore part of November, however, the proceedings for the sale of the steamer to the Chemical company languished on account of the firmness by which Mr. Rockefeller's agent, Gates, held the price at not less than $200,000, and the unwillingness of the Chemical company to let its need of a steamer operate to compel the purchase at a price considerably beyond the real value. The Chemical company during this period turned its attention to an effort to buy the *Winifred*, but nothing came of such effort. Upon the 31st of October, 1899, by letter from Carpenter, Secretary, to Curtis, the latter was notified that, in accordance with the terms of the original agreement, the obligations of the defendant terminated on the first day of November, on which day Curtis was notified to consider those obligations canceled. This letter called forth an emphatic protest by Curtis on the first of November and the statement that, even before the agreement of September sixteenth, he had given to the defendant the name of the intending purchaser, and that Carpenter had told him that the limitation of November first meant simply that to such period the exclusive power to find a purchaser was vested in Curtis, and Carpenter had agreed to pay the commission if the purchaser found by Curtis did actually buy the vessel. This view is corroborated by the testimony of Curtis and Carpenter both, and also by the conduct of the parties during the month of November, by which the defendant recognized that any sale made to the Chemical company would come through the original efforts of the broker Curtis. On the 27th of November, 1899, the defendant, by Carpenter, Secretary, notified the Chesapeake and Ohio Company that the defendant had received a cash offer in writing for the purchase of the steamer " of $208,750," and that under the terms of the charter party, if the Chesapeake Company did not avail itself of the option to buy, the charter had thirty days to run before turning the vessel over. On the twenty-eighth of November, by separate letter, the defendant, by Carpenter, Secretary, notified the Chesapeake Company that the defendant agreed to give the Chesapeake Company the time between noon of that day and Friday, December first, at noon, after which hour all claim to purchase the

steamer ceased, the thirty-day period to commence on the twenty-eighth of November. On the same twenty-eighth of November, the Chesapeake Company notified the defendant that the Chesapeake Company consented to the terms and conditions of the defendant's letters of that date. On the twenty-seventh of November the Chemical company, by Albert French, treasurer and transportation agent, wrote Gates, the manager of Rockefeller, that he was authorized by the Chemical company to accept "your offer for the purchase of the S. S. *City of Everett*, namely, Two hundred and eight thousand seven hundred and fifty ($208,750) dollars, purchasers to assume all responsibility for commission in lieu of the sum of Ten thousand ($10,000) dollars which is to be paid by sellers for services of the brokers in the transaction." On the twenty-eighth of November the defendant, by Carpenter, Secretary, wrote to Gates that the defendant had agreed that any negotiations commenced prior to November first, if terminated sucessfully, should have the benefit of the agreement as to commission and compensation, and inclosed a copy of the proposition of September sixteenth to the broker Curtis.

The thirty-day tenure of the steamer by the Chesapeake Company having expired on the twenty-eighth of December, on the twenty-ninth of December the formal agreement between the defendant and the Chemical company for the sale of the ship was made. It recited that the price was $208,750, the seller to pay the buyer $10,000 in lieu of all brokerage due or claimed by Curtis and Dayton, and the seller thereupon to assume no responsibility for brokerage services. A bill of sale was to be executed by the defendant simultaneously with the agreement and the Chemical company was to pay the consideration money, $208,750. Thereupon the defendant company would pay back to the Chemical company $10,000 in lieu of commissions and brokerage, and the Chemical company indemnified the defendant against all loss on account of the brokerage commissions, the Chemical company to defend any suit. The $10,000 was to be paid by the Chemical company to George W. Murray, counsel for the defendant, who was to deposit the fund in a trust company and pay the same in satisfaction of any judgment recovered against the defendant for brokerage. Upon the satisfaction of any judgment against defendant for brokerage, or a

receipt showing the payment of the claim to the brokers, the trustee would return the fund to the Chemical company, or so much as remained, together with interest allowed by the trust company.

It is evident that the jury would have been justified in finding that the brokers had earned a commission of five per cent upon the selling price, which is the sum arrived at by them, including the interest to the rendition of the verdict. To obviate the effect of the situation as heretofore displayed, the defendant, or rather the Chemical company, which was acting in the name of the defendant, undertook to prove an agreement initiated Friday, the twenty-fourth of November, and accepted on the twenty-seventh of November, the day of the sale, by which Dayton, the plaintiff, agreed with French, the treasurer and transportation agent of the Chemical company, to take $2,500 for the broker's commissions, in order to facilitate the sale or resurrect negotiations then supposed to be dead. In the interview of the twenty-fourth, according to the plaintiff's testimony, French said that his company would not pay $200,000 or $210,000, or anywhere near it; that it would have to be a general compromise. French also said, in the forenoon of the twenty-seventh, that nothing had been done in regard to negotiations for about a month; that he did not think the thing would go through. French, in his testimony, states that he received instructions from Mr. Gibbons, President of his company, some time after the seventeenth of November, to renew negotiations for the purchase of the *Everett*, and that he had talked with the plaintiff looking to reduction of commissions, assuring the plaintiff that it was his opinion the sale would never go through if all parties held out for full prices. French also says that on the morning of the twenty-seventh, the day of the sale, Dayton told him that if it were necessary to effect a trade the sum of $2,500 might be considered as the full brokerage. About noon of the same day French had an interview with Gates, the manager for Rockefeller, in which Gates fixed $200,000 net to the defendant as the best figure, and said that he would divide the brokerage at $2,500 with the seller. French thereupon called upon Gibbons, the president of his own company, who authorized French to write the letter of acceptance of that date, which letter fixes the price at $208,750, $10,000 being reserved for the broker's commissions, and the purchasers to assume all

responsibility for such commissions in consideration of such $10,000. The sale thereupon was practically complete, subject to the condition that the Chesapeake Company did not take the vessel at the price named, that company having until Friday, the first of December, to determine whether it elected to take at such price.

An important fact was unknown to both Dayton and French at the time they had their conversations about the reduction of the commission. On the seventeenth of November the directors of the Chemical company had authorized their executive committee to purchase the *Everett,* at a price not to exceed $200,000. The statement of French to Dayton, therefore, made several days later, that his company would not go anywhere near $200,000, was a misrepresentation of the fact, however innocently made, and the reason why French was not in a position to make the correct utterance was because his principal had withheld the knowledge of such limit from him. It is evident that on the day of sale the purchaser was willing to pay $200,000 and the vendor was willing to take $200,000. The purchaser did actually agree to pay at least $201,250, and the vendor did actually agree to take $198,750, the difference between the two sums being the amount of broker's commissions of $2,500, mutually divided. The purchaser was also willing to pay $208,750 in the contingency of having to take care of the broker's full commission of five per cent, and the naming of that sum as the purchase price in the agreement to sell, and in the notice to the Chesapeake and Ohio Company to compel their election, accepting both to have been made in good faith, presume an expectation on the part of the purchasing company to pay the entire sum stated, of which the purchaser would only receive $198,750 and the brokers $10,000. The notice to the Chesapeake and Ohio Company was not given by the purchasing company, but was a part of the understood arrangement, as it was well known that it had to be given by the vendor which had given the charter party containing the option to the Chesapeake and Ohio Company. It would have been a fraud upon the latter company to have named a false price as duly offered by an outsider, instead of the *bona fide* cash offer called for by the charter party. We must assume, therefore, that the sum stated to the Chesapeake and Ohio Company as the amount of the offer was given in good faith, as that company had the right to suppose it was, and, therefore, that the

expectation of reduction in the amount of the broker's commissions was a reliance upon their willingness to receive $2,500 commission under all the circumstances of the case rather than a legal right to defend against any claim in excess of $2,500, for in the latter case the actual price would only have been $201,250, and should have been so named to the Chesapeake and Ohio Company. It hardly lies in the mouth of the purchasing company, which has under the circumstances to pay the commission to the brokers, to say that the vendor had the right to name the sum of $208,750 to the holder of the option to purchase in order to effect a sale already accomplished, but for the outstanding option to the Chemical company, for $7,500 less at the expense of the brokers. It will also be remembered that the brokers were entitled to their five per cent commissions in case the Chesapeake and Ohio Company elected to take the steamer at the price named.

It would seem, therefore, that the jury was justified in finding that the negotiations were not practically at an end on the morning of the twenty-seventh of November unless concessions were made, and that the agreement of Curtis and Dayton to reduce the commissions to $2,500 did not constitute a procuring cause of the sale. Such agreement was, therefore, ineffective as an executory promise to alter or modify the existing agreement, as the whole foundation upon which it was based fell to the ground and there was no substantial consideration for it. It would be inequitable to hold that the brokers should stand absolutely three-quarters of the loss, and relatively a far greater proportion, on account of the promise to take a lesser commission, when that promise, as the events showed, was regarded as an unimportant factor in reaching the far greater and more important conclusions between the vendor and the purchaser.

This view is very materially fortified by the finding of the jury, which may be amply sustained so far as is necessary, as to the misconception of Dayton, under which the promise was made, which was induced by the action of French, the agent of the purchaser. We need not assume that the nearness of the trade was apparent to French, and may look with indulgent eyes upon what he did in hurried action, supposing he was making a last effort to bring the parties together. This favorable view does not destroy the right of reliance by the broker who did impose upon him the duty of exer-

cising judgment in making the proposed reduction of broker's commission, nor exonerate the principal for whom French acted so that it may claim relief from responsibility produced by misconception, for which it and its agent were largely responsible. Had French known that the executive committee of his company had ten days before determined to buy at a cost not to exceed $200,000 he could have refrained from disclosing that information and remained silent, but he could not state that the negotiations were at an end or that his company would not listen to the payment of such a sum. His ignorance, occasioned by the failure of the principal to disclose its own action to him, may not exempt that principal from the effect of misconception on the part of the broker. French did know, however, that he had been instructed by the president of his company to renew negotiations shortly after the seventeenth of November, and in this respect the information he gave to Dayton was misleading. Such misrepresentations, even though innocent, producing natural misconception as to the importance of the promise, relieve the promisor under an executory contract, even though they do not constitute intentional fraud. It was so held in regard to the covenant to pay an annuity for twenty years for the use of a coal mine where it turned out that the mine was useless, although the owner had innocently represented it to be valuable. (*Rosevelt* v. *Dale*, 2 Cow. 129.) The rule applied to an ordinary mistake of facts. (*Champlin* v. *Laytin*, 18 Wend. 407.) A misrepresentation of the vendor innocently made as to the quantity of land conveyed will furnish relief. (*Belknap* v. *Sealey*, 14 N. Y. 144.) There is a wide difference between the case of an ordinary action for deceit and that of an attempted enforcement of an executory promise. In the latter case innocent misrepresentation relieves from the performance of that promise. (ANDREWS, Ch. J., *Kountze* v. *Kennedy*, 147 N. Y. 129.) Rescission comes from a false affirmation of a material fact, though innocently made. (*Smith* v. *Richards*, 13 Pet. 26 ; *M'Ferran* v. *Taylor*, 3 Cranch, 270 ; *Turner* v. *Ward*, 154 U. S. 618.)

It will not answer for the purchasing company, which is the party to pay the commissions under the arrangement between the vendor and the purchaser, to say that French was not the agent of the seller, which alone had made the contract with Dayton and Curtis for commissions, and, therefore, it is not bound by his state-

ments or action. This suit is against the vendor. In the name of that vendor, defendant, the vendee, undertakes to reserve a part of the purchase money because of a promise made to its own agent by the broker. That agent cannot be efficient to make a contract which is binding unless his whole action is effective to determine its validity.

I am, therefore, of the opinion that the vendor and vendee were mutually right in naming $208,750 as the price for which the *Everett* was sold, and in reserving thereout $10,000 at least as compensation for the broker's services. The jury acted within its power of judgment under the evidence, and the verdict should not be disturbed. The interest on that verdict will be provided for in the usual way.

# Cases

## DETERMINED IN THE

# FOURTH DEPARTMENT

### IN THE

## APPELLATE DIVISION,