(36 Misc. Rep. 223.)

### DAYTON v. AMERICAN STEEL BARGE CO.

(Supreme Court, Trial Term, Kings County. November, 1901.)

1. REAL ESTATE—COMMISSIONS.

A defendant who continues to permit a person to act as his agent until the completion of a sale, after notifying him that his services are terminated, is liable to him for commissions when he has been the means of procuring the sale.

**2. SAME.**

>    A real estate agent agreed to reduce his commissions when the sale
> was made, being so induced by the bona fide misstatement of the agent
> of the vendee that, unless there was a reduction in the commissions, the
> sale would fall. It was proved that such reduction was not the procur-
> ing cause of the sale. *Held,* that the executory promise of the agent
> was without consideration, and could not be enforced in an action for
> his commissions, either by the vendor or vendee.

Action by Frank A. Dayton against the American Steel Barge
Company. Verdict for plaintiff.

Wilcox, Adams & Green (George Bethune Adams, of counsel),
for plaintiff.

Gifford, Stearns & Hobbs, for defendant.

RUSSELL, J. The plaintiff recovered a verdict of $11,322.87 for
broker's commissions on the sale of the steamship City of Everett.
Before the cause was submitted to the jury, the defendant requested
the court to instruct the jury to render a verdict for the sum only
of $2,500 and interest. That motion was reserved until the verdict
of the jury upon certain specific questions and their general verdict
was rendered. Upon the reversed motion counsel present their re-
spective views as to what the verdict should be, the difference be-
tween them being the same as upon the trial,—as to whether the
plaintiff was entitled to a full commission of 5 per cent. or only
a fixed compensation of $2,500. The original agreement was for
the 5 per cent. commission, and the defense relies upon a mod-
ification by agreement made the day of the sale to take $2,500 in
order to insure a sale, which modifying agreement is attacked as
founded upon mistake, misrepresentation, or fraud. The jury finds,
aside from the general verdict: First. "On the morning of Novem-
ber 27, 1899, were the negotiations practically at an end unless con-
cessions were made by the American Steel Barge Company, the
American Agricultural Company, and the agents, Curtis and Day-
ton? No." Second. "Did the agreement of Curtis and Dayton to re-
duce commissions to $2,500 constitute a procuring cause of the sale?
No." Third. "Did French intentionally mislead Curtis and Dayton
as to the effect of the negotiations for the sale, by reason of which
Curtis and Dayton agreed to take $2,500, when in fact the sale
would have gone through without such an agreement? A. Yes."
The steamship City of Everett was owned by the American Steel
Barge Company, the defendant here. The barge company was will-
ing to sell on obtaining its price. It was represented primarily by
Carpenter, its secretary; but in October, 1899, the stock of the
company having been purchased by John D. Rockefeller, the re-
maining negotiations were mainly carried on by Gates, the busi-
ness manager of Rockefeller. On the 3d day of April, 1899, a
charter party was given to the Chesapeake & Ohio Company. By
this instrument the steamship was chartered for one year from the
5th of April, 1899. At any time after 6 months from the beginning
of the charter the owners had the right to cancel upon 30 days'
written notice, but said charterers had the right to immediately elect
to purchase the steamer at the price agreed upon with a bona fide

purchaser. On the 16th of September, 1899, the defendant, by Carpenter, secretary, by letter agreed to pay Curtis (who is represented by the plaintiff by assignment) a commission of 5 per cent. on the selling price if Curtis succeeded in selling the steamer, and, if after his clients had given the defendant in writing a firm cash bid for the vessel, the Chesapeake & Ohio Company decided to buy her, a commission was to be paid the same as though he made the sale. The proposition was to remain open till the 1st of November. Between that date and the 31st of October Curtis interested the American Agricultural Chemical Company, which was in serious need of a steamer to carry its products from the southern part of this country to the north, in the purchase of the steamer. The latter part of October and the fore part of November, however, the proceedings for the sale of the steamer to the chemical company languished on account of the firmness by which Mr. Rockefeller's agent, Gates, held the price at not less than $200,000, and the unwillingness of the chemical company to let its need of a steamer operate to compel the purchase at a price considerably beyond the real value. The chemical company during this period turned its attention to an effort to buy the Winifred, but nothing came of such effort. Upon the 31st of October, 1899, by letter from Carpenter, secretary, to Curtis, the latter was notified that, in accordance with the terms of the original agreement, the obligations of the defendant terminated on the 1st day of November, on which day Curtis was notified to consider those obligations canceled. This letter called forth an emphatic protest by Curtis on the 1st of November, and the statement that, even before the agreement of September 16th, he had given to the defendant the name of the intending purchaser, and that Carpenter had told him that the limitation of November 1st meant simply that to such period the exclusive power to find a purchaser was vested in Curtis, and that Carpenter had agreed to pay the commission if the purchaser found by Curtis did actually buy the vessel. This view is corroborated by the testimony of Curtis and Carpenter both, and also by the conduct of the parties during the month of November, by which the defendant recognized that any sale made to the chemical company would come through the original efforts of the broker Curtis. On the 27th of November, 1899, the defendant, by Carpenter, secretary, notified the Chesapeake & Ohio Company that the defendant had received a cash offer in writing for the purchase of the steamer "of $208,750," and that under the terms of the charter party, if the Chesapeake Company did not avail itself of the option to buy, the charter had 30 days to run before turning the vessel over. On the 28th of November, by separate letter, the defendant, by Carpenter, secretary, notified the Chesapeake Company that the defendant agreed to give the Chesapeake Company the time between noon of that day and Friday, December 1st, at noon, after which hour all claim to purchase the steamer ceased, the 30-day period to commence the 28th of November. On the same 28th of November the Chesapeake Company notified the defendant that the Chesapeake Company consented to the terms and conditions of the defendant's letters of that

date.  On the 27th of November, the chemical company, by Albert French, treasurer and transportation agent, wrote Gates, the manager of Rockefeller, that he was authorized by the chemical company to accept "your offer for the purchase of the S. S. City of Everett, namely, two hundred and eight thousand seven hundred and fifty dollars ($208,750), purchaser to assume all responsibility of commission in lieu of the sum of ten thousand dollars ($10,000), which is to be paid by sellers for services of the brokers in the transaction."  On the 28th of November the defendant, by Carpenter, secretary, wrote to Gates that the defendant had agreed that any negotiations commenced prior to November 1st, if terminated successfully, should have the benefit of the agreement as to commission and compensation, and inclosed a copy of the proposition of September 16th to the broker Curtis.  The 30-day tenure of the steamer by the Chesapake Company having expired on the 28th of December, on the 29th of December the formal agreement between the defendant and the chemical company for the sale of the ship was made.  It recited that the price was $208,750, the seller to pay the buyer $10,000 in lieu of all brokerage due or claimed by Curtis and Dayton, and the buyer thereupon to assume all responsibility for brokerage services.  A bill of sale was to be executed by the defendant simultaneously with the agreement, and the chemical company was to pay the consideration money, $208,-750.  Thereupon the defendant company would pay back to the chemical company $10,000 in lieu of commissions and brokerage, and the chemical company indemnified the defendant against all loss on account of the brokerage commissions, the chemical company to defend any suit.  The $10,000 was to be paid by the chemical company to George W. Murray, counsel for the defendant, who was to deposit the fund in a trust company, and pay the same in satisfaction of any judgment recovered against the defendant for brokerage.  Upon the satisfaction of any judgment against defendant for brokerage, or a receipt showing the payment of the claim to the brokers, the trustee would return the fund to the chemical company, or so much as remained, together with interest allowed by the trust company.

It is evident that the jury would have been justified in finding that the brokers had earned a commission of 5 per cent. upon the selling price, which is the sum arrived at by them, including the interest to the rendition of the verdict.  To obviate the effect of the situation as heretofore displayed, the defendant, or rather the chemical company, which was acting in the name of the defendant, undertook to prove an agreement initiated Friday, the 24th of November, and accepted on the 27th of November, the day of the sale, by which Dayton, the plaintiff, agreed with French, the treasurer and transportation agent of the chemical company, to take $2,500 for the broker's commissions, in order to facilitate the sale or resurrect negotiations then supposed to be dead.  In the interview of the 24th, according to the plaintiff's testimony, French said that his company would not pay $200,000 or $210,000, or anywhere near it; that it would have to be a general compromise.  French also said, in the forenoon of the

27th, that nothing had been done in regard to negotiations for about a month; that he did not think the thing would go through. French, in his testimony, states that he received instructions from Mr. Gibbons, president of his company, some time after the 17th of November, to renew negotiations for the purchaser of the Everett, and that he had talk with the plaintiff looking to reduction of commissions, assuring the plaintiff that it was his opinion the sale would never go through if all parties held out for full prices. French also says that on the morning of the 27th, the day of the sale, Dayton told him that, if it were necessary to effect a trade, the sum of $2,500 might be considered as the full brokerage. About noon of the same day French had an interview with Gates, the manager for Rockefeller, in which Gates fixed $200,000 net to the defendant as the best figure, and said that he would divide the brokerage at $2,500 with the seller. French thereupon called upon Gibbons, the president of his own company, who authorized French to write the letter of acceptance of that date, which letter fixes the price at $208,750, $10,000 being reserved for the broker's commissions, and the purchasers to assume all responsibility for such commissions in consideration of such $10,000. The sale thereupon was practically complete, subject to the condition that the Chesapeake Company did not take the vessel at the price named, that company having until Friday, the 1st of December, to determine whether it elected to take at such price.

An important fact was unknown to both Dayton and French at the time they had their conversations about the reduction of the commission. On the 17th of November the directors of the chemical company had authorized their executive committee to purchase the Everett at a price not to exceed $200,000. The statement of French to Dayton, therefore, made several days later, that his company would not go anywhere near $200,000 was a misrepresentation of the fact, however innocently made; and the reason why French was not in a position to make the correct utterance was because his principal had withheld the knowledge of such limit from him. It is evident that on the day of sale the purchaser was willing to pay $200,000, and the vendor was willing to take $200,000. The purchaser did actually agree to pay at least $201,250, and the vendor did actually agree to take $198,750, the difference between the two sums being the amount of broker's commissions of $2,500, mutually divided. The purchaser was also willing to pay $208,750 in the contingency of having to take care of the broker's full commission of 5 per cent., and the naming of that sum as the purchase price in the agreement to sell and in the notice to the Chesapeake & Ohio Company to compel their election, accepting both to have been made in good faith, presume an expectation on the part of the purchasing company to pay the entire sum stated, of which the purchaser would only receive $198,750 and the brokers $10,000. The notice to the Chesapeake & Ohio Company was not given by the purchasing company, but was a part of the understood arrangement, as it was well known that it had to be given by the vendor, which had given the charter party containing the option to the Chesapeake & Ohio Company. It would have been a fraud upon the latter company to have named a

false price as duly offered by an outsider, instead of the bona fide cash offer called for by the charter party. We must assume, therefore, that the sum stated to the Chesapeake & Ohio Company as the amount of the offer was given in good faith, as that company had the right to suppose it was, and therefore that the expectation of reduction in the amount of the broker's commissions was a reliance upon their willingness to receive $2,500 commission under all the circumstances of the case, rather than a legal right to defend against any claim in excess of $2,500; for in the latter case the actual price would only have been $201,250, and should have been so named to the Chesapeake & Ohio Company. It hardly lies in the mouth of the purchasing company, which has, under the circumstances, to pay the commission to the brokers, to say that the vendor had the right to name the sum of $208,750 to the holder of the option to purchase in order to effect a sale already accomplished, but for the outstanding option to the chemical company for $7,500 less at the expense of the brokers. It will also be remembered that the brokers were entitled to their 5 per cent. commission in case the Chesapeake & Ohio Company elected to take the steamer at the price named.

It would seem, therefore, that the jury was justified in finding that the negotiations were not practically at an end on the morning of the 27th of November, unless concessions were made; and that the agreement of Curtis and Dayton to reduce the commissions to $2,500 did not constitute a procuring cause of the sale. Such agreement was therefore ineffective as an executory promise to alter or modify the existing agreement, as the whole foundation upon which it was based fell to the ground, and there was no substantial consideration for it. It would be inequitable to hold that the brokers should stand absolutely three-quarters of the loss, and relatively a far greater proportion, on account of the promise to take a lesser commission, when that promise, as the events showed, was regarded as an unimportant factor in reaching the far greater and more important conclusions between the vendor and the purchaser. This view is very materially fortified by the finding of the jury, which may be amply sustained, so far as is necessary, as to the misconception of Dayton, under which the promise was made, which was induced by the act of French, the agent of the purchaser. We need not assume that the nearness of the trade was apparent to French, and may look with indulgent eyes upon what he did in hurried action, supposing he was making a last effort to bring the parties together. This favorable view does not destroy the right of reliance by the broker, who did impose upon him the duty of exercising judgment in stating the proposed reduction of broker's commission, nor exonerate the principal for whom French acted, so that it may claim relief from responsibility produced by misconception, for which it and its agent were largely responsible. Had French known that the executive committee of his company had 10 days before determined to buy at a cost not to exceed $200,000, he could have refrained from disclosing that information, and remained silent; but he could not state that the negotiations were at an end, or that his company would not listen to the payment of such a sum. His ignorance, occasioned

by the failure of his principal to disclose its own action to him, may not exempt that principal from the effect of misconception on the part of the broker. French did know, however, that he had been instructed by the president of his company to renew negotiations shortly after the 17th of November, and in this respect the information he gave to Dayton was misleading. Such misrepresentations, even though innocent, producing natural misconception as to the importance of the promise, relieve the promisor under an executory contract, even though they do not constitute intentional fraud. It was so held in regard to the covenant to pay an annuity for 20 years for the use of a coal mine, where it turned out that the mine was useless, although the owner had innocently represented it to be valuable. Rosevelt v. Dale, 2 Cow. 129. The rule applied to an ordinary mistake of facts. Champlin v. Laytin, 18 Wend. 407, 31 Am. Dec. 382. A misrepresentation of the vendor, innocently made, as to the quantity of land conveyed, will furnish relief. Belknap v. Sealey, 14 N. Y. 144, 67 Am. Dec. 120. There is a wide difference between the case of an ordinary action for deceit and that of an attempted enforcement of an executory promise. In the latter case innocent misrepresentation relieves from the performance of that promise. Andrews, C. J., Kountze v. Kennedy, 147 N. Y. 129, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651. Rescission comes from a false affirmation of a material fact, though innocently made. Smith v. Richards, 13 Pet. 26, 10 L. Ed. 42; McFerran v. Taylor, 3 Cranch, 270, 2 L. Ed. 436; Turner v. Ward, 154 U. S. 618, 14 Sup. Ct. 1179, 23 L. Ed. 391. It will not answer, for the purchasing company, which is the party to pay the commissions under the arrangement between the vendor and the purchaser, to say that French was not the agent of the seller, which alone had made the contract with Dayton and Curtis for commissions, and therefore it is not bound by his statements or action. This suit is against the vendor. In the name of that vendor, defendant, the vendee, undertakes to reserve a part of the purchase money because of a promise made to its own agent by the broker. That agent cannot be efficient to make a contract which is binding unless his whole action is effective to determine its validity. I am therefore of the opinion that the vendor and vendee were mutually right in naming $208,750 as the price for which the Everett was sold, and in reserving thereout $10,000 at least, as compensation for the broker's services. The jury acted within its power of judgment under the evidence, and the verdict should not be disturbed. The interest on that verdict will be provided for in the usual way.

Ordered accordingly.