## In re CONSTRUCTION MATERIALS CORPORATION.

### No. 1035.

District Court, D. Delaware.

Dec. 11, 1936.

Ayres J. Stockly (of Hastings, Stockly & Duffy), of Wilmington, Del., Max Swiren and Frank Greenberg (of Levinson, Becker, Peebles & Swiren), both of Chicago, Ill., for trustees.

John J. Morris, Jr., U. S. Atty., of Wilmington, Del., James W. Morris, Asst. Atty. Gen., and George F. Foley, Hadley W. Libbey, and C. Keefe Hurley, Attys., Department of Justice, all of Washington, D. C., for the United States.

NIELDS, District Judge.

Exceptions to report of special master disallowing a claim of the United States for $441,133.20. The claim represents the additional cost to the United States occasioned by reletting two dredging contracts. The liability is expressly recognized and set forth in a provision of the dredging contracts, dated, respectively, February 17, 1933, and March 6, 1933, between United

States of America and Construction Materials Corporation organized under the laws of Delaware. These contracts provide:

"Article 9. Delays—Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in Article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event, the Government may take over the work and prosecute the same to completion by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. * * *"

January 17, 1934, Construction Materials Corporation was adjudicated a bankrupt by this court and receivers were appointed. After the enactment of section 77B of the Bankruptcy Act (48 Stat. 912, see 11 U.S.C.A. § 207), debtor filed a petition for reorganization, and the persons theretofore acting as receivers were appointed trustees. At the time of adjudication, debtor was obligated under the two contracts with United States mentioned above for dredging at Monroe Harbor, Mich., and in Cape Cod Canal, Mass.

February 10, 1934, United States terminated the debtor's right to proceed with the work under both contracts pursuant to article 9 above recited. The date for completion of the work was past and little had been done.

The proof of claim filed in this court by the United States July 16, 1934, is as follows:

"The United States Government is a creditor of Construction Materials Corporation, a Delaware corporation; that the amount due on said claim is approximately the sum of $441,133.20; that nothing has been paid thereon; that the said sum is justly due; that claimant holds no security other than the following:

Bond executed by American Security Co.—$186,400.

Bond executed by American Security Co.—122,000.

"The claim is based upon the following documents:

Contract dated February 17, 1933, No. W—272—eng—193

Contract dated March 6, 1933, No. W—175—eng—219

"The facts upon which the claim is based and the nature and character of the claim are as follows:

"The Construction Materials Corporation defaulted on the contracts set forth above, and the right of the contractor to proceed under said contracts was terminated under authority contained in Article 9 thereof. The work was readvertised and awards made to the Great Lakes Dredge and Dock Company at the following increased costs:

| Contract and contract number | Unit Price | Est. contract consideration |
|---|---|---|
| Dredging in Cape Cod Canal | | |
| Construction Materials Corp., W—175—eng—219. | 24.4¢ per cubic yard | $244,000.00 |
| Great Lakes Dredge & Dock Co., W—175—eng—253 | 35.8¢ per cubic yard | 333,083.20 |
| | Approximate Excess Cost | $ 89,083.20 |
| Dredging Section 'A,' Monroe Harbor, Mich. | | |
| Construction Materials Corp., W—272—eng—193 | 14.4¢ per c. y. dredging $2.60 per ton riprap | $372,800.00 |
| Great Lakes Dredge & Dock Co., W—272—eng—223 | 29¢ per c. y. dredging $4.25 per ton riprap | 724,850.00 |
| | Approximate Excess Cost | $352,050.00 |

512

"The exact amount of excess cost chargeable against the Construction Materials Corporation by reason of the default under these contracts can not be definitely determined until the work provided for is completed, since the quantities stated in said contracts are estimated and the total yardage removed and tonnage placed in the performance of these items of work will determine the final cost of the Government. Therefore, supplemental claim will be filed upon completion of the work showing the exact amount of the claim of the United States against the Construction Materials Corporation."

September 29, 1934, the trustees of debtor filed objections to the allowance of the claim of the United States upon the ground that debtor theretofore had elected, and thereby did elect, to rescind both contracts.

July 25, 1934, the court appointed a special master to receive, examine, consider, and recommend the allowance or rejection of all claims of creditors, including the claim of the United States above recited. A report as to this claim has been filed, and the government has filed exceptions thereto.

MONROE HARBOR CONTRACT.

Monroe Harbor is located in the improved mouth of Raisin river, which empties into Lake Erie through several outlets about 18 miles northeast of Toledo, Ohio, and 40 miles south of Detroit. Many years ago the city of Detroit dredged a cutoff canal 1,300 feet long and 100 feet wide, beginning at a point about 3,000 feet upstream from the river end of the United States Canal. Before 1929 the government had provided a channel 9 feet deep and 100 feet wide extending from the 9-foot depth in Lake Erie to the lower wharves at the city of Monroe. Newton Steel Company, on the north bank of the United States Canal, had dredged a channel 18 feet deep, 80 feet wide, and about 5,300 feet long in the lake outside of the existing piers, and an inner channel 18 feet deep, 70 feet wide, and about 3,000 feet long. In 1929 Congress requested the Board of Engineers to determine if further improvement of this harbor was advisable. In response the Board submitted in December, 1929, what is known in this case as the McCoach survey report recommending deep water facilities at Monroe Harbor; i. e., a channel 21 feet deep

and 300 feet wide in Lake Erie and 200 feet wide through the existing canal and in Raisin river, with riprapped protecting dikes. Respecting "Materials" the report stated:

"Materials.—A limestone ledge rock underlies the area under discussion. Probings indicate that in Lake Erie, in the United States Canal, and in Raisin River to a point about 6,800 feet from the outer end of the existing piers, the surface of the ledge rock lies at greater depths than 23 feet below low-water datum of 570.8 feet above mean tide level at New York. At a distance of about 2,400 feet upstream (westerly) from the above point the rock surface is about 21 feet below low-water datum, and continuing westerly the rock surface rises at a more rapid rate.

"Excepting the rock and timber bank revetment along the south side of the United States Canal, the two existing piers at the mouth of the United States Canal, and pile and concrete foundations of old buildings, one on the outer side of each pier, all of which would require removal by dipper dredge, the material overlying the ledge rock consists of sand, silt, and stiff clay removable by a modern hydraulic dredge."

Copies of maps describing the area in section "B," but not in section "A," and the proposed dredging were obtainable without cost at the engineer's office in Detroit, and are listed both in the invitation for bids received by the debtor and in the specifications accompanying that invitation.

Debtor's headquarters were in Chicago. In 1933 debtor had been in the dredging business over 25 years. It then had three dredging contracts with the United States, including the Monroe Harbor contract. J. R. Sensibar was president of debtor. It was claimed that he had developed a method of hydraulic unloading of boats and of making sand fills. Also that he had developed equipment for the excavation, transportation, and distribution of dirt, gravel, stone, and rock. In any event, he assumed to design cutters for channel dredging at Monroe Harbor.

January 3, 1933, United States issued an "Invitation for Bids," stating that bids would be received January 20, 1933, "for dredging approximately 3,812,000 cubic yards, place measure, of material, consisting of sand, clay and boulders, from Mon-

roe Harbor, Michigan." Attached to the invitation for bids was a set of "Specifications" which was to become part of any contract between the United States and the successful bidder.

The specifications divided the job into section "A" and section "B." Bids were invited to do the work in either or both sections. The same specifications applied to each section. It was estimated that 2,300,000 cubic yards of materials would be removed from section "A" and 1,512,000 cubic yards would be removed from section "B." The channel was divided into stations 100 feet in length. Section "A" extended from station 48 on the west to station 240 on the east, a distance of 19,200 feet. The specifications under the headings "Character of Materials" and "Work covered by Price bid" state:

"The materials to be removed are believed to be sand and clay, with some hardpan and boulders, and, in addition; revetment, foundation piling, underbrush, stumps, snags, trees, etc., along the banks of the United States and Monroe Canals; piling, stone-filled cribs, etc., within the contract area; the concrete foundation of Monroe Light; refuse from the Monroe paper mills; and possibly buildings or portions thereof not removed by the owners from within the limits of the proposed work.

"Bidders are expected to examine the work and decide for themselves as to its character and to make their bids accordingly. In the event that materials, structures, or obstacles of a materially different character are encountered during the progress of the work, and the cost of their removal or satisfactory treatment obviously would be, in the opinion of the contracting officer, either in excess of, or less than the unit price bid by the contractor, the contracting officer, in either alternative, will then proceed in accordance with the provisions of article 4 of standard Government Form No. 23, or any authorized revision thereof."

"The price bid per cubic yard for dredging shall cover the cost of removal and disposal of all material and obstructions (see paragraphs 9 and 13) encountered except ledge rock. The removal of ledge rock will not be required. Material to be classified as ledge rock must be natural rock in place of such size and composition as in the opinion of the contract-ing officer shall require special plant for its removal, and shall not include fragments of rock or boulders capable of being removed by the dredge in one piece. * * *"

For a year or two before debtor filed its bid for this dredging it had general knowledge that the United States was contemplating the work. J. R. Sensibar testified he was "quite familiar with the general lay of the land there" and "had made a sand fill for the Newton Steel Company which adjoins this job." About January 7, 1933, debtor obtained copies of the invitation for bids and the specifications. Debtor was not among those to whom an invitation and specifications had been sent. Before filing the bid debtor's engineers went to the site and made a superficial examination of the area.

January 20, 1933, eight bids were opened in the district engineer's office at Detroit. It was found that debtor was the lowest bidder for work on section "A" and was the highest bidder for work on section "B." In its bid debtor proposed to use the hydraulic dredge Sandmaster then equipped to remove loose material.

The district engineer called debtor to the government office the same day bids were filed and questioned the ability of debtor's dredge to do the work. Debtor stated it was prepared to equip the dredge with standard rose or basket type cutters to penetrate and crush the material so it could then be drawn into the suction pipes of the dredge. The district engineer testified:

"Q. Can you give us now, Major Crawford, the substance of that conversation, what you said and what Sensibar or Brinkman said? A. Well, it was substantially on the question of the adequacy of the plant which he had included in his bid. He had specified the dredge Sandmaster in his bid, and we asked him what that was, and he said it was a sand boat that he had used in the sand and gravel business. We pointed out that a boat of that type could not do the job. He pointed out that he realized that, too, and proposed to put the standard type of cutter on the Sandmaster to equip it for channel dredging. * * *

"Q. With reference to the statement as to the type of cutter that he was to put on the Sandmaster, what do you mean by the Rose type or basket type cutter? (See

footnote.[1]) A. Well, it is a revolving type of cutter that is supported on the end of a ladder and which is in turn supported on the dredge, and it is a type that is usually found in hydraulic dredges, that is, channel dredges."

Under cross-examination J. R. Sensibar testified: ·

"Q. So that the discussion, before you were awarded the bid by Major Crawford, was in substance that you needed cutters along with the hydraulic equipment in order to do the work? A. That is right. We told him we were going to put on cutters.

"Q. You said you would put them on? A. That is right."

February 17, 1933, the contract was awarded to debtor for doing the work in section A. By the contract debtor agreed to "furnish all labor and materials, and perform all work required for dredging section A, Monroe Harbor, Michigan, and constructing 1200 lineal feet of dyke on each side of the channel all as described in paragraph 2 of the specifications hereinafter referred to for the consideration of 14.4 cents per cubic yard, place measurement, for dredging, and $2.60 per ton for riprap. * * * The work shall be commenced within 30 calendar days after the date of receipt by contractor of notice to proceed and shall be completed on or before December 1, 1933, subject to the proviso in paragraph 3 of the sepcifications."

Articles 3 and 4 of the contract provide for an equitable adjustment of the amount due under the contract where the contractor encounters subsurface conditions differing from those indicated in the specifications.

"Article 3. Changes.—The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and (or) specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than Five Hundred Dollars shall be ordered unless approved in writing by the head of the department or his duly authorized representative. Any claim for adjustment under this article must be asserted within ten days from the date the change is ordered, unless the contracting officer shall for proper cause extend such time, and if the parties can not agree upon the adjustment the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.

"Article 4. Changed conditions.— Should the contractor encounter, or the Government discover, during the progress of the work, subsurface and (or) latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they materially differ from those shown on the drawings or indicated in the specifications, he shall at once, with the written approval of the head of the department or his representative, make such changes in the drawings and (or) specifications as he may find necessary, and any increase or decrease of cost and (or) difference in time resulting from such changes shall be adjusted as provided in Article 3 of this contract."

March 4, 1933, United States notified debtor to proceed with the work. Two months after the signing of the contract debtor, through a subcontractor, began removing the piles and obstructions with a dipper dredge, which was equipment of the subcontractor.

April 25, 1933, the district engineer wrote debtor:

"It is requested that you advise this office without delay as to the approximate

1

date when you expect to commence work. * * * Your attention is invited to the fact that the notice to proceed * * * was * * * on March 4, 1933.

"Although work on the removal of piles and other obstructions has been started on your Monroe contract it is believed that a start should be made with the dredge at the earliest possible date. It will be appreciated if you will advise us at once just what your program of operations * * * contemplates."

Here the government inquired when the contractor would start with its dredge properly equipped for the work.

May 8, 1933, the district engineer telegraphed debtor: "No reply received my letter April 25 reference your proposed operations * * * Monroe Contract. Please give this matter your immediate attention and submit to me in writing your program of operations setting forth definitely by dates and character of plant just what your program is."

May 12, 1933, debtor wrote to the district engineer: "We are now reconstructing our hydraulic dredge equipment to suit this particular work. In a few days we expect to be in a position to give you a definite date as to when the dredge will be ready for operation. The dredge we propose to use on this work is our Turbine Electric Motorship 'J. R. Sensibar.' Anticipating your approval of the substitution of this vessel for our Motorship 'Sandmaster' named in our bid of January 20, 1933, this is requested in a separate letter enclosed. This dredge will be equipped with 2–30″ hydraulic cutter suctions and two discharge lines to operate in parallel. To the best of our knowledge, this dredge will be the largest and most powerful hydraulic dredge afloat. The estimated capacity of this dredge is 3000 cubic yards per hour, or approximately 1,500,000 cubic yards per month. On this basis the job should be done in a very short time, even allowing liberally for organizing and adjusting the new equipment."

On the same date debtor also wrote to the district engineer: "Owing to the amount of yardage involved in this job, we find that our Turbine Electric Motorship 'J. R. Sensibar' will be better suited for this work, having 2–30″ suctions and an estimated capacity of 3000 cubic yards per hour, whereas our Motorship 'Sandmaster' has 2–20″ suctions and has a proportionately smaller capacity of less than half of the Motorship 'J. R. Sensibar.'"

May 16, 1933, the district engineer replied: "With regard to the substitution of the motorship J. R. Sensibar for the motorship Sandmaster, on the Monroe Harbor contract, this office has no objection thereto, but it must be understood that we do not guarantee that the plant you propose is adequate for the performance of the work. The true measure of the capacity of the plant will be its actual performance on the work."

May 25, 1933, the district engineer wrote to debtor:

"With regard to the Monroe contract, this office can not concede that the dredge J. R. Sensibar will remove material at a rate of 1,500,000 yards per month. It must be realized that the use of this dredge for channel deepening is somewhat in the nature of an experiment. In my opinion, it would be taking an unwarranted chance on the completion of the contract to delay the placing of this dredge on the work on the assumption of any such output. If it were to be started on the work today, it would have to maintain an average output of 360,000 cu. yds. per month in order to complete the contract on time. It is doubted that the actual capacity of the plant will greatly exceed the figure stated.

"I must therefore demand that the alterations to the J. R. Sensibar be accomplished without delay and that it be on the site of the work ready for operation not later than July 1, 1933."

June 24, 1933, debtor wrote to the district engineer:

"This is in reply to your letter of June 19th requesting information as to the present status of the work of altering our Turbine Electric Motorship J. R. Sensibar for the purpose of fitting her for the dredging work under our contract for dredging Section A Monroe Harbor, Michigan.

"As we fully realize the extent of the work involved under this contract and the limited time in which to accomplish it, we deemed it expedient to alter our dredge to some extent and install suitable and adequate equipment specially designed to do this work."

August 24, 1933, debtor's engineer Gerhardt sank a test pit with the aid of the subcontractor which disclosed the presence of hardpan. Respecting this test J. R. Sensibar testified:

"Q. When did you first examine any of the hardpan in the subsurface in the contract area? * * * A. About the latter part of August or early in September.

"Q. Describe the circumstances under which you saw the hardpan. A. One of the daily reports from the job received at the office in Chicago showed—

"Mr. Foley: I object to that, if he is going to talk about a daily report.

"Q. Just tell us where you saw the hardpan and the circumstances in the field. Don't discuss any of the records. A. I saw it at about Station 50, approximately, 48 or 50, on the job about the latter part of August, 1933.

"Q. Where did you see it? A. I saw it in a pit that was excavated at that point by a dragger.

"Q. Who was with you at the time you saw it? A. Mr. Frank Gerhardt.

"Q. Did he call your attention to the presence of hardpan there? A. Yes. * * *

"Q. Will you answer the question, your reply to Mr. Gerhardt? A. I told him we anticipated having some hardpan in the extreme inland end of the job, but I was very much concerned as to the quantity of it, and that this looked as though it was pretty high. * * *

"Q. Where, with reference to ledge rock, is hardpan generally found? A. Usually next to the rock, or close to it.

"Q. Did you get any indication from the pit you examined at that time as to the total quantity of hardpan in the area generally? * * * A. No sir. We just found it was higher, than we figured that it would be at that point."

Here it may be appropriate to anticipate events and to interrupt the chronological development by including two statements of J. R. Sensibar showing when he made further efforts to learn about hardpan:

"Q. When did you first determine that there was an appreciable amount of hardpan in the contract area? A. After that last test. We operated about three days, as I recall it, starting with about the 18th of January, 1934, to about the 21st, and we then realized that the hardpan that we had previously located at Station 48 or 50, continued at much higher level than we anticipated, and that it would go as far as 70 at least; at least 70. * * *

"Q. When did you first receive information as to the aggregate quantity of hardpan within the contract area? A. When the test pits were sunk for the Trustees here this last fall.

"Q. Fall of 1934? A. 1934."

September 18, 1933, the district engineer telegraphed debtor: "Wire me definitely when dredge Sensibar may be expected at Monroe stop remaining time of contract is so short that some positive action on your part is absolutely essential."

Debtor replied: "Shipyard promises completion dredge Sensibar end this week will leave immediately upon completion stop should be Monroe next week."

October 17, 1933, the dredge Sensibar arrived on the site of the work. It was equipped with disc cutters. (See footnote.[2]) It was not equipped with the standard

---

2

DISC-TYPE CUTTER

rose cutter promised the United States. Disc cutters are not standard equipment on channel dredges. After working a few days, it was necessary to send the Sensibar back to the shipyard for repairs.

October 27, 1933, the Sensibar again arrived at Monroe Harbor and was assigned by the government to a position at station 110 in the outer harbor in which to commence dredging.

November 1, 1933, rough weather in the lake upset one of the cutter pontoons and the dredge returned to the Toledo shipyards for repairs.

November 27, 1933, the Sensibar returned and remained at or near station 70 until December 21, 1933, when operations were stopped. In this period no appreciable dredging was accomplished. The equipment controlling the disc cutters which had been installed on the dredge broke down nearly 40 times. The disc cutters were unsuited for dredging hardpan or material with hardpan characteristics.

It is incredible that debtor's equipment should break 40 times without revealing that the cause of the breaking was the strain placed on the machinery by the "material" in the lower levels. Debtor must have realized that it was attempting to dredge material with hardpan characteristics. Debtor was experienced in the business and must have known it was up against hardpan. Yet, with the right to elect to rescind a voidable contract, debtor elected to affirm the contract and to continue to attempt to perform without rescission or adjustment.

December 27, 1933, with operations shut down, the district engineer wrote debtor:

"In view of the difficulties which you are having in getting the dredge J. R. Sensibar into production under your contract for dredging Monroe Harbor, Mich., I feel that it has become necessary for me to have a complete understanding with you and the bonding company as to the proper steps to insure the completion of this work.

"I am therefore requesting that you set a date some time about January 2d to January 5th to meet me here in Detroit and that you arrange to have here at that time a representative of the American Surety Company and such other persons as you may consider advisable, to the end that we may come to a final understanding of the whole situation and determine a future course of action.

"Please advise me as early as practicable with regard to the date you desire to set."

January 5, 1934, as requested, debtor conferred with the district engineer. Debtor claimed the causes of the breakdown could be remedied, and asked for a chance to make repairs.

January 17, 1934, debtor filed a voluntary petition in bankruptcy and receivers were appointed.

January 18, 1934, the Sensibar returned to the site of the work at or about station 70 and continued for 3 or 4 days, when it was shut down completely. At this time the dredge did very little work. The disc cutters which debtor was still attempting to use could make no headway with hardpan.

In this experience of a day or two at the same station, debtor claims, mirabile dictu, that for the first time it realized the extent of the hardpan. To be sure, the Sensibar had undergone repairs, some time between December 27, 1933, and January 18, 1934, but the obvious cause of the breakdown remained the material handled. Here again debtor elected not to rescind a contract voidable because of a mutual mistake as to the quantity of hardpan to be dredged but elected to affirm the contract.

January 21, 1934, the receivers posted notices at the site of the work that they would not be responsible for wages. Thereupon the work was finally abandoned.

Between January 20 and February 10, 1934, the United States tried to get information from the receivers as to the completion of the work.

February 10, 1934, receiving no satisfactory assurances from debtor, the government gave to the receivers the following written notice:

"Reference is made to the contract of the Construction Materials Corporation of Chicago, with the United States, number W—272—Eng.—193 dated February 17, 1933, for the dredging of Section A, Monroe Harbor, Mich., and constructing 1,200 lineal feet of dike on each side of the channel.

"You are notified that on account of default in performance of that contract,

the Government, under Article 9 thereof, hereby terminates the right of the contractor to proceed with the work. Under the provisions of said Article 9, the Government expects to hold both the American Surety Company of New York, as surety, and the estate of the Construction Materials Corporation, for any and all excess cost that may be incurred by the Government in completing the work required by said contract."

February 19, 1934, the trustees, then receivers, filed with the referee in bankruptcy a report in which appears the following: "It was believed by the management of Construction Materials Corporation that these vessels [the Sandmaster and Sensibar] could be adapted to perform the work of hydraulic dredges where material of a coarser nature than sand was to be removed. Large sums had been spent in fitting these vessels out, and it was the failure of the vessels to perform the dredging work which exhausted the capital of the Construction Materials Corporation, and which led to the failure to perform the contracts, within the time allotted by the government."

This was the attitude of the trustees concerning the situation several months before the government filed its claim.

April 23, 1934, having advertised for bids, the United States relet the work to Great Lakes Dredge & Dock Company at a cost much higher than that provided in the debtor's contract. The claim of the United States filed in this proceeding is for the difference in this cost.

July 16, 1934, the United States filed the proof of claim covering the excess cost of reletting both dredging contracts as recited above in this opinion.

In August, 1934, the new contractor commenced work with two hydraulic dredges properly equipped for channel work, and a dipper dredge.

September 28, 1934, the trustees filed the following objections to the allowance of the claim of the United States: "The debtor herein has heretofore elected to set aside and avoid contract No. W—272—eng—193 for dredging section 'A' of Monroe Harbor, Michigan, and the Trustees of the Debtor's estate do hereby elect to set aside and avoid said contract," etc.

In legal effect, debtor's objections amount to an election to rescind the dredging contract of February 17, 1933, upon which the United States brought suit.

The record is void of any suggestion that the trustees had elected to rescind the dredging contract of February 17, 1933, before filing the above objections. The initial notice of an election to rescind is contained in the above objections filed September 28, 1934. Indeed, during the life of the contract, debtor made no complaint or claim that it was encountering material different from that indicated in the specifications, and the trustees made no complaint or claim in this regard from the date of their appointment up to and including the date of filing their objections to the government's claim on September 28, 1934. This was the first notice the government had that the debtor or its trustees claimed the material was different from the material as represented.

Succinctly stated, debtor's reasons for electing to rescind are: (1) Debtor relied upon and was induced to enter into the contract by reason of the claimants' false representation that no considerable quantity of hardpan was present in the contract area. (2) Debtor and United States entered into the contract under a mutual mistake of fact as to the character of the material; that is, under the mistaken belief that the quantity of hardpan to be dredged was small and negligible. (3) By reason of the presence of a substantial quantity of hardpan, the character of the material actually encountered in dredging was materially different from that indicated in the specifications so as to entitle the debtor to an equitable adjustment of the contract price to an amount equal to, or in excess of, the price paid to Great Lakes Dredge & Dock Company.

November 15, 1934, the trustees sank test pits in the contract area and claimed they discovered thereby the extent of the hardpan formation throughout the entire area of section A. This was 4 months after the proof of claim had been filed by the United States in these proceedings.

In his report of July 20, 1935, the special master found: "So, while the Government represented that it believed that the material to be dredged contained only a negligible quantity of hardpan when in reality it was more than fifty per cent, * * * the representation was merely an expression of opinion, not a misrepresentation of fact, was actually and honestly entertained by the Government and therefore the defense of misrepresentation as to Monroe Harbor fails."

This court fully concurs in the above finding that the representation was merely an expression of opinion, not a misrepresentation of fact, and that the opinion was actually and honestly entertained by the government. The court finds as a conclusion of law that the defense of misrepresentation fails as to the Monroe Harbor contract.

"When the contract was made, both the Company and the Government believed that the amount of hardpan present was negligible, while as a matter of fact it constituted at least fifty per cent. of the material to be dredged; the Company discovered the approximate amount of hardpan in January, 1934, and has done nothing since to affirm the contract. * * *

"So the Trustees are entitled successfully to interpose as a defense to the claim of the Government under the Monroe Harbor contract their right to rescind that contract because of the mutual mistake entertained by the Government and the Company as to the amount of hardpan to be dredged when they entered into the contract."

The above finding is dealt with hereafter:

"I have no difficulty in deciding that the amount of hardpan actually existing in the contract area, a fact, as I have said, unknown to both parties, comes within the description of a sub-surface or latent condition at the site materially different from that indicated in the specification. * * *

"I therefore conclude that the Company was entitled to an equitable adjustment of the amount to be paid to it under its contract to an amount equal to that to be paid the Great Lakes Dredge & Docks Company under the relet contract and that the termination of the contract by the Government excused the Company and the Trustees from following the procedure laid down by the contract as a prerequisite to such adjustment."

The court rejects this finding. The provision of the contract for an equitable adjustment of the amount due contractor was solely for the benefit of the contractor. To be effective at all it must be invoked by him and the procedure prescribed by the contract followed.

"4. If the claim of the Government is allowed there should not be set off against it the sum of $56,188.90, the fair price for the work done by the debtor at Monroe Harbor or any part thereof."

The court rejects this finding. Debtor is entitled by way of counterclaim to the amount it paid the subcontractor and also to the amount due for actual dredging by debtor and not paid for.

From the entire record respecting the Monroe Harbor project including the facts above recited the court makes the following findings:

1. The dredging contract of February 17, 1933, was voidable when made because it was made under a mutual mistake of fact as to the quantity of hardpan in the area to be dredged. The debtor, then the contractor, could have elected to rescind the contract.

"Where the parties assumed a certain state of facts to exist, and contracted on the faith of that assumption, they should be relieved from their bargain if the assumption is erroneous. This is a sound principle of justice, and should be applied without any further question as to whether the mistake is intrinsic or extrinsic, or whether it affects identity or quality." Williston on Contracts, § 1544.

"A mistake as to a matter of fact, to warrant relief in equity, must be material, and the fact must be such that it animated and controlled the conduct of the party. It must go to the essence of the object in view, and not be merely incidental. The court must be satisfied, that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved." Grymes v. Sanders et al., 93 U.S. 55, 60, 23 L.Ed. 798.

2. Debtor was grossly negligent. (a) Debtor promised the government before its bid was accepted to equip its dredge with standard equipment for channel dredging: i. e., with a rose cutter. Debtor repudiated that promise. It equipped its dredge with a disc cutter which was not standard equipment and which was ineffective. Debtor was fully advised it would encounter "some hardpan." At no time was debtor's dredge equipped to dredge "some hardpan." This is a significant fact. If debtor had been equipped to handle "some hardpan," it would have been equipped to handle some more. Whether the quantity was "some" or 50 per cent. of the whole, appropriate equipment to dredge hardpan

was required. That the job was a dredging job is proved by the use of hydraulic dredges by the contractor to whom the work was relet. (b) Assuming debtor did not learn of the presence of hardpan in quantity before January, 1934, debtor was negligent in not so learning. The record establishes that the depth of hardpan could be readily determined by sinking test pits. If debtor learned the approximate quantity of hardpan by its casual dredging in January, 1934, the same test could have been made before executing the contract so that an adequate bid could have been made, or such a test could have been made after the execution of the contract and the right of rescission exercised or an equitable adjustment of the contract price sought. Hardpan is a geological stratum found next above the ledge rock. Giving hardpan its harshest definition, hardpan is semi-rock in character and must be broken up, not sliced, to be dredged. If found at one end of section A, it would probably be found at some depth along the whole section. The real question for the contractor was not the character but the quantity of hardpan within the contract depth. Here the debtor contracted to dredge to a depth of approximately 21 feet. His problem was the depth or the height of the hardpan. (c) Debtor was negligent in delaying for a year and a half before exercising its election to rescind. This election was exercised on September 28, 1934, a year and a half after the contract was made and nine months after the contract should have been fully performed. (d) Debtor defeated for over a year the construction of an important public project and the public interest therein, and thereby and to that extent injured the government. (e) Debtor relied upon the mechanical skill of its president, J. R. Sensibar, to design adequate equipment. Debtor disregarded the manifest requirements of good dredging practice.

■ "It is frequently said that equity will not reform or rescind a contract if the petitioner has been guilty of negligence, or at any rate of·gross negligence. * * * Unreasonable delay in seeking relief after the discovery of a mistake justifying it will bar relief; but what delay is unreasonable depends on the special circumstances of each case indicating negligent sleeping on his rights by the party seeking relief and injury caused to the other party by the delay." Williston on Contracts, § 1596.

■ "It is, of course, a general principle of law that a party who desires to rescind a contract must do so within a reasonable time after discovering the ground for rescission. Or, stated differently, if a party, after discovering a valid ground for rescission, choose to go on with the contract and does go on with it, his choice is final. He is not permitted to go on and at the same time retain his right to rescind." Passaic Valley S. Com'rs v. Holbrook, Cabot & Rollins Corp. (C.C.A.3) 6 F.(2d) 721, 724.

■ "Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted." Grymes v. Sanders et al., 93 U.S. 55, 62, 23 L.Ed. 798.

■ 3. Debtor affirmed the voidable dredging contract of February 17, 1933, after learning of its right to rescind. (a) By learning from a test pit sunk by debtor's engineers at station 50 in August, 1933, of the presence of hardpan and failing to elect to rescind. (b) From the experience of 40 breakdowns in December, 1933. These must have revealed that the cause was the character of the material being dredged and that the material was hardpan. (c) By the test pit sunk in January, 1934, when debtor admits it learned the quantity of hardpan in the contract area. After each test and fresh discovery the debtor elected not to rescind but to affirm the contract.

4. A court of equity will not rescind a contract under the above circumstances.

■ In ·concluding consideration of the Monroe Harbor project, certain general observations ·are appropriate. United States as a contracting party is entitled to be. treated as an individual, subject to the same penalties for wrongdoing and to the same defenses allowed others. Rescission is a disaffirmance of the bargain it-

self expressed in a formal contract. Contracts are made to substitute an agreed certainty for the uncertainty of events. If the bargain between debtor and the United States be rescinded, each party is remitted to the very uncertainty against which it sought to insure by making the contract. In addition, the bond of the surety to insure debtor's performance is dissolved. There is nothing in the record to move a chancellor to dissolve or rescind the contract of February 17, 1933.

### Cape Cod Canal.

The Cape Cod Canal is a sea-level waterway extending from the head of Buzzards Bay to a point on Cape Cod Bay about 15 miles southeast of Plymouth Harbor, Mass. It was dug by a private company and opened for navigation in 1914. During the World War control and operation of the canal was assumed by the Director General of Railroads. Before the war ended proposals were under way for its purchase by the United States. In 1921 Col. Burr, then district engineer at Boston, conducted an investigation and prepared a report to Congress with respect to deepening and widening the canal. In this report appears the following statement: "Information is not available for the exact classification of this material between hydraulic and dipper dredging and boulders. Available information indicates that about 20 per cent. of the original excavation was done by hydraulic dredges and sundry estimates have placed boulders at 5 per cent. or 800,000 cubic yards. Hydraulic dredges removed only the lighter, top material and were unable to remove the difficult material of the lower levels. For this reason and the lesser availability of nearby spoil areas, hydraulic dredging is estimated at but 1,000,000 cubic yards or about 7.5 per cent. of the total and this estimate is conservative in its effect on total cost. Boulders are estimated at 400,-000 cubic yards or about 3 per cent. of the total. The powerful dredges required for this excavation will remove boulders up to 3 cubic yards each as part of their regular operation and the above estimate appears ample for boulders of larger size."

In 1927 the United States purchased the canal. Colonel Cheney, as district engineer, assisted by Col. Park, made a report to Congress recommending the widening of the canal. In this report it is stated: "To determine the nature of the material, borings were taken during the present survey every few hundred feet along the land line and at somewhat greater distances in Buzzards Bay. They indicate that the character of the excavation will be similar to that found with the existing canal, namely, chiefly sand with a small percentage of gravel, and cobbles, occasional layers of clay and hardpan, and large and small boulders. In the original excavation, the latter were met with sometimes alone and sometimes in reefs and pockets. With the exception of the largest boulders, all of the new material should be handled without difficulty by excavators of modern type. Experience with the present canal indicated that about 4 or 5 percent. of the total yardage was of boulders of which possibly three-quarters were handled without blasting. It was the presence of these boulders which caused the abandonment of the hydraulic methods first attempted and made dipper dredges necessary."

In 1932 the eastern portion of the canal to about station 180 was widened by a 70-foot cut of the south bank.

January 23, 1933, when most of the eastern work had been finished, Col. Park, then district engineer, issued an "Invitation for Bids" with "Specifications" for a canal cut on the western section of the canal. The proposed work was located on the south side extending from about 7,500 feet westerly of Sagamore bridge to about 2,000 feet westerly of the railroad bridge. The specifications provided for a cut in the south bank 70 feet in width between stations 190 and 400, and a cut not exceeding 20 feet in width between stations 400 and 420. Debtor received copies of the invitation for bids and specifications 4 or 5 days after their issuance.

The invitation for bids advised prospective bidders that maps "showing the location of the latest wash borings and other data made on the various areas may be seen at this office and should be consulted by intending bidders before submitting their bids."

Debtor at once secured copies of the maps referred to as "Wash Borings." These maps contained upon their face the following tabulation:

## Wash Borings in Present Canal Channel

| Boring No. | Station | Depth below M.L.W. | Elev. | Material |
|---|---|---|---|---|
| 20A | 435+45 | 41.8 | 56.5 | Sand, soft to hard |
| 20B | 428+20 | 42.0 | 56.3 | Mud & sand, loose gravel & sand, hard sand |
| 20C | 424+42 | 45.5 | 52.9 | Hard sand, loose gravel |
| 21 | 419+90 | 41.8 | 56.6 | Sand & gravel |
| 21A | 410+0 | 41.5 | 57.0 | Sand, coarse gravel & sand |
| 22 | 400+05 | 42.5 | 56.0 | Soft sand |
| 22A | 390+55 | 39.8 | 58.7 | Sand, loose gravel, coarse sand and gravel |
| 23 | 382+70 | 45.0 | 53.5 | Loose gravel |
| 23A | 371+53 | 38.3 | 60.2 | Sand, sand & gravel |
| 24 | 359+65 | 41.4 | 57.0 | Soft sand, coarse loose gravel |
| 24A | 349+65 | 41.3 | 57.1 | Small rocks & sand, loose gravel |
| 25 | 338+10 | 41.5 | 56.9 | Soft sand, coarse loose gravel |
| 25A | 330+46 | 9.9 | 88.5 | Sand, boulders |
| 25B | 330+46 | 12.2 | 86.2 | Sand & rocky, hard gravel |
| 25C | 330+58 | 39.0 | 59.4 | Sand & rocky, hard gravel at 84.2, very hard gravel at 78.3 |
| 26 | 320+55 | 40.9 | 57.4 | Sand, gravel, sticky clay |
| 26A | 320+84 | 38.6 | 59.6 | Sand, medium soft sand |
| 26B | 310+80 | 7.9 | 90.3 | (Trial hole) Sand, hard gravel at 90.3 |
| 26B | 310+73 | 36.9 | 61.3 | Sand |
| 27 | 300+22 | 35.0 | 63.2 | Sand, coarse hard gravel at 79.8, hard packed gravel |
| 27A | 290+30 | 37.6 | 60.6 | Sand, hard packed sand |
| 28 | 280+10 | 45.5 | 52.5 | Sand, gravel |
| 28A | 270+32 | 40.3 | 57.9 | Soft sand, medium sand |
| 29 | 260+35 | 29.7 | 68.5 | Sand, gravel & clay, hard at 74.1, boulder, very hard |
| 29A | 260+57 | 24.1 | 74.1 | Sand, gravel & clay at 79.3; Blue & yellow clay |
| 29B | 260+65 | 30.7 | 67.5 | Sand, gravel & clay, hard clay |
| 29A | 250+10 | 42.0 | 55.7 | Sand |
| 30 | 240+20 | 46.5 | 51.1 | Sand, loose coarse gravel |
| 30A | 240+05 | 33.8 | 63.3 | Sand, sand & clay hard |
| 30A | 229+80. | 42.2 | 55.3 | Sand & boulders, loose sand |
| 31 | 219+70 | 38.1 | 59.0 | Sand |
| 31A | 210+00 | 40.1 | 57.2 | Sand |
| 32 | 199+85 | 38.0 | 59.1 | Sand, hard gravel at 83.5 |
| 32A | 189+60 | 40.3 | 56.7 | Sand, coarse gravel, loose sand, hard sand |
| 33 | 179+90 | 40.7 | 56.2 | Sand, soft to hard |
| 33A | 170+00 | 35.3 | 61.6 | Sand, gravel & hard sand at 83.3 |
| 34 | 159+90 | 46.3 | 50.3 | Sand |

The specifications gave only a general enumeration of materials but described specifically and in detail the size and quantity of boulders uncovered and removed in dredging the eastern area. Paragraph 13 provided:

"Character of Materials—The material to be removed is believed to be clay, gravel, sand, riprap, cobbles and boulders; but bidders are expected to examine the work and decide for themselves as to its character and to make their bids accordingly. In the event that materials, structures, or obstacles of a materially different character are encountered during the progress of the work, and the cost of their removal or satisfactory treatment obviously would be, in the opinion of the contracting officer, either in excess of, or less than the unit price bid by the contractor, the contracting officer, in either alternative, will then proceed in accordance with the provisions of article 4 of standard Government Form No. 23, or any authorized revision thereof.

"The dredging under the contract now in force has uncovered and removed from the area west of the Sagamore Bridge boulders ranging in size from 1 cubic yard to 64 cubic yards, from a minimum of 15 cubic yards of boulders per 100 linear feet in the vicinity of the Sagamore Bridge to 68 cubic yards of boulders per 100 linear feet in the vicinity of Station 160+00. It is believed that the percentage of large boulders will decrease in the westerly section of the area to be dredged, but the government does not guarantee that this will be the case. The average yardage of pay boulders between Sagamore Bridge and Station 165+00 has been about 25.3 cubic yards per 100 linear feet. A considerable quantity of boulders, smaller than 1 cubic yard, were removed, the number and yardage being impossible to estimate, since they were handled with the general run of material in the dipper of the plant employed."

The information thus furnished by the government, particularly the wash bor-

ings, was studied and analyzed by the debtor. Employing the data on the wash borings maps and the specifications, debtor's engineers determined that more than 92 per cent. of the material to be dredged would consist of sand, clay, and gravel. Upon this information, and after an examination of the banks of the canal, debtor submitted a bid of 24.4 cents per cubic yard.

February 11, 1933, when the bids were opened, debtor was found to be the low bidder. The plant specified in debtor's bid was the hydraulic dredge Sandcraft characterized as a seagoing hopper dredge with a capacity of 2–20″ pumps, 18 c. y. and condition "Excellent." Upon opening the bids the acceptance of debtor's bid was protested by a competing bidder. The district engineer and representatives of debtor discussed debtor's ability to perform the work. February 13, 1933, the district engineer wrote and telegraphed to the debtor that, unless good cause to the contrary were shown within 5 days, he would recommend rejection of its bid. February 14, 1933, the district engineer conferred with J. R. Sensibar in New York. Debtor's equipment and the problem of boulder removal were considered. Following this conference debtor agreed to make a formal reply to the district engineer's letter and the engineer agreed to go to Chicago to inspect the equipment. February 18, 1933, debtor wrote the district engineer:

"We have made a thorough investigation at the site of the work of the conditions under which the plant we propose to employ will be required to operate. We have also made a thorough examination of the kinds of material to be removed. These investigations, coupled with twenty-five years of experience, during which time we have handled over forty million yards of a great variety of materials under varying conditions, a great deal of which has been handled with the very type of equipment which we propose to use here, leads us to believe that our method of doing this work is the most efficient way of excavating and disposing of the material in this cut. Our investigation further discloses that the amount of material, namely boulders, requiring other equipment is very small, probably not exceeding one or two per cent. * * *

"To sum up, we wish to state that we can put sufficient equipment on this work within the specified time, and that the equipment that we propose to use is practical for handling the class of material described in paragraphs 13 and 14 of the specifications.

"We are not unmindful of the difficulties to be encountered in the Cape Cod Canal job. Our organization has specialized in performing unusual and difficult work over a period of more than 25 years."

February 20, 1933, the district engineer conferred with debtor's officers in Chicago and was advised that substitution of the hydraulic dredge Sandmaster for the Sandcraft was desired. The district engineer inspected drawings of proposed improvements in the Sandmaster and then made a thorough detailed inspection of the Sandmaster itself. Thereupon the district engineer informed the debtor that he was satisfied with the Sandmaster with the changes proposed and would recommend the award of the contract to debtor provided auxiliary plant for the removal of boulders was furnished. Also that pending the arrival of the Sandmaster there be placed on the job equipment competent to remove boulders and other material at the rate of 1,500 cubic yards per day.

March 1, 1933, a hearing was held before the assistant chief of engineers upon the competitor's protest against the award of the contract to the debtor. The protest was overruled. March 6, 1933, a contract between debtor and the United States was executed.

June 2, 1933, the Capitol, a lighter equipped with a derrick and clam-shell bucket for the removal of boulders, began work on the job. A series of delays in the completion of the improvements in the Sandmaster ensued which provoked threats from time to time by the district engineer that unless the vessel arrived at once the contract would be terminated.

September 6, 1933, the Sandmaster arrived at Buzzards Bay and commenced work the following day. The dredge was thoroughly inspected by the district engineer. He found it was equipped so that cobbles and boulders between 3 inches and 24 inches in size were screened out of the intake pipe before reaching the pump and were dropped into a steel trap or sphere. Notwithstanding repeated adjustments during three weeks, the grizzly failed to screen properly. In October, 1933, the district engineer, after conferences with debtor's representatives, again threatened to terminate the right of the debtor to pro-

ceed with the contract. Thereupon debtor repeatedly promised to furnish new and additional equipment to supplement the work of the Sandmaster. Meanwhile debtor was devising and having a new grizzly installed on the Sandmaster. Progress was extremely slow because of the very large percentage of cobblestones and boulders in the material being excavated. The presence of such large quantities of rock interfered with effective suction by the dredge. Moreover, the cobbles and small boulders which were screened out and dropped into the steel trap constituted so large a percentage of the total material that the steel trap would fill up long before any substantial quantity of fine material had been accumulated in the hoppers. As a consequence repeated trips to the dump were necessary with hoppers almost empty. These difficulties compelled the Sandmaster to give up work on November 10, 1933.

November 15, 1933, after the Sandmaster ceased operation, debtor's representatives informed the district engineer that the material encountered was wholly different from that indicated in the specifications and wash borings. November 28, 1933, a formal written demand was made upon the district engineer requesting an equitable adjustment of the contract price. On that date the debtor wrote to the district engineer:

"We beg to advise that the character of materials we are encountering at the Cape Cod Canal under our contract with you is materially different from that indicated in the drawings and specifications covering this work.

"Based on the character of materials indicated in the drawings and specifications for this work we rebuilt the 'Sandmaster' to handle materials under approximately 22″ in size. We have rechecked our design and find that our original calculations were correct. We have provided ample capacity for the cobble stones from approximately 6″ to 22″ in size, in proportion to the quantities of other sizes of materials in the excavation as indicated in the drawings and specifications. From actual experience in the excavation we find that the proportion of coarse sizes is many times that indicated in the drawings and specifications, and from experience to date may run as much as six times or more the quantities or percentages there indicated. * * * In addition to this difficulty the proportionate quantity of boulders from 22″ up is similarly many times the quantity or percentage indicated by the drawings and specifications. This further interferes with the ability of the 'Sandmaster'· suction to get to the material it can pump, further retarding the progress of loading the vessel.

"We therefore request that our contract for this work be modified to cover the additional time and cost occasioned by the changed character of materials and conditions."

December 4, 1933, the district engineer telegraphed the debtor: "Regret no justification for me to recommend modification your contract stop No estimate furnished in specifications of rocks under one cubic yard stop Contract price twelve dollars fifty cents instead of twenty four and four tenths cents for rock over one and one half cubic yards should have worked to advantage of contractor stop Authority to terminate your contract and readvertise has been requested."

In reply debtor telegraphed: "Facts do not justify your request for authority to terminate our contract stop We protest such action stop Since you evidently referred matter to Washington we are asking chief of engineers for hearing."

December 12, 1933, there was a conference with the chief of engineers. Debtor's ability to finish the contract was discussed and the conference ended by affording the debtor an opportunity to get more equipment. In response to the demand for an adjustment of the contract price the Chief of Engineers told J. R. Sensibar that no such adjustment would be considered until the debtor showed substantial progress in the work.

Debtor consumed the balance of the month of December in repeated conferences with the Chief of Engineers and the district engineer as to what additional dipper dredge equipment would be satisfactory to them and in an effort to obtain such equipment. December 29, 1933, all operations ceased. January 17, 1934, debtor was adjudicated a· bankrupt and receivers were appointed. After a conference in Washington between the Chief of Engineers and the receivers, notice of termination of the debtor's right to proceed with the work was sent to the receivers on February 10, 1934. April 8, 1934, the work was relet to Great Lakes Dredge & Dock Company. July 16, 1934, a proof of claim

was filed by the United States to which the trustees filed objections on September 29, 1934, amended objections on December 15, 1934, and still further amended objections February 12, 1935.

The three defenses are: (1) Misrepresentation; (2) mutual mistake; and (3) an equitable adjustment of contract price under the contract provisions: The claim of the government must be disallowed if any one of these defenses is sustained.

Debtor was induced to enter into the contract by the representation that wash borings revealing subsurface explorations as tabulated on the government maps had been made by the government, whereas in truth no wash borings had been made. And, further, by the representation that the material to be excavated was of the character depicted on the wash borings maps; that is, sand, clay, and gravel, with only occasional boulders. The wash borings maps supplied the only specific information as to the character of the materials in the contract area. These maps purported to show the location of wash borings along the canal channel. The holes were roughly 1,000 feet apart and were alternately placed on each side of the channel. The wash borings within the contract area were Nos. 21 to 32, inclusive. The data on the face of the maps indicates the penetration of each boring and describes the material encountered in each hole. The various classes of material were enumerated in a running account beginning with the material first encountered. Frequently specific elevations were given wherever obstructions were encountered or some new material appeared.

Debtor prepared its bid from estimates made in Chicago from the data furnished by the government. It was not until December, 1934 that the trustees or any one connected with the debtor discovered that no wash borings had ever been made but only jet probings.

A "jet probing" differs from a "wash boring" in the purpose for which it is made, the equipment and process it employs, and the information which can be obtained from its use. It consists of driving a single 2-inch or 4-inch pipe into the material from a lighter upon which a pile driver has been mounted. The penetration is accomplished by attaching a nozzle to the end of the pipe and forcing water through the pipe at a pressure of 60 to 120 pounds. The nozzle reduces the opening at the end of the pipe to one inch when a 2-inch pipe is used. The water pressure creates a disturbance in the subsurface material in advance of the movement of the pipe and allows penetration. In addition, a 2,500 pound steam hammer is rested upon the pipe and occasionally used to drive it down. With the downward movement of the pipe under water pressure the operator in charge records in his notebook his opinion as to the nature of the material being penetrated by the pipe at successive elevations. No samples are taken. The operator relies entirely upon what "feel" he gets as the pipe moves downward. As shown by the tabulation penetration was effected to an average depth of 38 feet below mean low water, being one and one-half times the depth required in debtor's contract. The holes were speedily made. The average time consumed for each probing was from ten to twelve minutes and at times the operation was completed in two to three minutes. This process is a familiar method of obtaining information as to the elevation of ledge rock. At times it is used to determine the relative density of various strata of material. It was properly designated as a "jet probing." This classification was repeated by every witness on behalf of the trustees and was not disputed by any government witness. The testimony of technical experts and the literature on the subject, including the government's own publications, proved that the tests made by the government were wholly different from wash borings.

Wash borings are used for the determination and classification of subsurface material. Dredge men use wash borings for the purpose of determining "the quantity of various classes of materials to be dredged." The object of the process is to obtain and examine samples. The equipment consists of two pipes—an outer casing 2" or 2½" in diameter and an inner jet pipe ¾" to 1" in diameter. The outer casing is forced into the material and then the inner jet pipe with water pressure supplied by a hand pump of approximately 25 pounds is used to wash up the samples of material in the opening between the jet pipe and the outer casing. The samples are collected in a tub or bucket on the lighter employed. The material is allowed to settle and is then examined to determine its character. At times the compactness of the soil makes it necessary for the jet pipe to move in advance of the outer casing to aid its penetration. In certain in-

stances a drill is affixed to the end of the jet pipe and the material is cut up and more readily brought to the surface by the water. Both in the taking of samples, and in the use of an outer casing and an inner jet pipe, wash borings differ fundamentally from jet probings.

The tabulated data called "wash borings" were furnished by a government engineer named Tibbetts employed on the Cape Cod Canal. He testified in this case and characterized the methods used by him as "jet probings." All the experts described the Tibbetts' process as a jet probing and not a wash boring. The material to be dredged was in reality wholly different from that indicated by the tabulation on the wash borings maps. The description of the material on the wash borings maps was a misrepresentation of its character. The maps indicated that substantially all of the material to be dredged was sand, clay, and gravel and only a small percentage boulders. Of the twenty-nine probings made in the contract area only one disclosed a boulder before reaching project depth. All of the material described above project depth consisted of clay, sand, and gravel with the single exception of one boulder. Cobbles are not mentioned. The wash borings maps plainly indicated to a bidder that the material to be removed was practically all sand, clay, and gravel.

Thus the wash borings maps contained material misrepresentations which induced the debtor to enter into the contract of March 6, 1933.

█ Any material misrepresentation by which a party is induced to enter into a contract confers upon the misled party a right to avoidance, even though the misrepresentation may be made without knowledge of its falsity. "It is not necessary in order that a contract may be rescinded for fraud or misrepresentation that the party making the misrepresentation should have known that it was false. Innocent misrepresentation is sufficient. For though the representation may have been made innocently, it would be unjust to allow one who has made false misrepresentations even innocently, to retain the fruits of a bargain induced by such representations. This is often called a doctrine of courts of equity as distinguished from courts of law, and doubtless in its origin it was such; but, at the present time, it is rather a distinction between a right of rescission on the one hand whether that right is asserted in a court of equity, in a court of law, or without the aid of a court, and an action for damages on the other hand." 3 Williston on Contracts, § 1500.

█ "Whether the party thus misrepresenting a fact, knew it to be false, or made the assertion, without knowing whether it were true or false, is wholly immaterial; for the affirmation of what one does not know, or believe to be true, is equally, in morals and law, as unjustifiable, as the affirmation of what is known to be positively false. And even if the party innocently misrepresents a fact, by mistake, it is equally conclusive; for it operates as a surprise and imposition on the other party. Or, as Lord Thurlow expresses it, in Neville v. Wilkinson [1 Bro. C. C. 546], 'it misleads the parties contracting, on the subject of the contract.' " Smith v. Richards, 38 U.S. (13 Pet.) 26, 36, 10 L.Ed. 42.

█ The special master found that a fair price for the work done by the debtor under the Cape Cod Canal contract and not paid for was $52,435.88. It is conceded that the debtor cannot obtain an affirmative judgment against the United States in this proceeding. Such amount, however, should be allowed as a counterclaim against any sum found due the United States under the portion of its claim based on the Monroe Harbor contract. "When the United States comes into Court to assert a claim it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter." United States v. The Thekla, 266 U.S. 328, 339, 45 S.Ct. 112, 113, 69 L.Ed. 313.

█ In the Monroe Harbor project the dredging contract was voidable for mutual mistake but the conduct of the contractor barred rescission. In the Cape Cod Canal project the dredging contract was voidable for misrepresentation and fraud. This misrepresentation and fraud constitute an equitable defense to any suit or claim based on the contract, and there was nothing in the conduct of the contractor to bar the recognition and enforcement of such defense.

The report of the special master should be modified in accordance with this opinion.

This opinion contains a statement of the essential facts and of the law applica-

ble thereto in conformity with the rule (Equity Rule 70½, 28 U.S.C.A. following section 723).